[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 246 
Defendant Empiregas of Ardmore appeals from judgments based on adverse jury verdicts rendered in these two cases, which were consolidated for trial. The jury found that Empiregas wrongfully interfered with plaintiffs' employment opportunities. The jury found that Empiregas fraudulently induced plaintiffs Linda Gail Coffman and Vernon Hardy into signing employment contracts with non-competition clauses in them, and that, therefore, Empiregas could not legally assert against plaintiffs the covenants not to compete contained in those contracts. The jury further found that Empiregas was liable for fraud because it concealed material information from plaintiffs. We affirm.
Empiregas hired Hardy on November 16, 1971, and Coffman on September 1, 1972, to work in its Ardmore plant. Empiregas, a subsidiary of Empire, Inc., in Lebanon, Missouri, retails liquified petroleum gas in north Alabama. Plaintiffs' contracts with Empiregas contained covenants not to compete that prohibited plaintiffs, upon termination with Empiregas, from seeking employment with any other liquified petroleum gas company within a fifty-mile radius of Ardmore for a period of three years. Empiregas required plaintiffs to sign new contracts each year. All of these contracts contained the same noncompetition provision.
After working for Empiregas for ten years, plaintiffs acquired fully vested interests in shares of Empire, Inc., stock as part of an employee stock ownership incentive plan. On December 6, 1982, Empire, Inc., and Exco Acquisition Corporation entered into an agreement and plan of merger. Under this agreement, the employees' stock in the incentive plan was to be sold and replaced with cash and a debenture due after the year 2000.
In February 1983, Paul Stallman, an agent of Empiregas, informed plaintiffs of a meeting on the merger, and asked them to return the proxy cards they would receive and to vote in favor of the merger. Stallman informed them that if the shareholders approved the merger, each employee would receive $20.00 for each share he owned "within sixty days." However, the merger agreement itself stated that no employee could receive any cash from the sale of his stock until after his termination or retirement. In May 1983, plaintiffs received the proxy cards and a statement setting out the conditions of the merger. This statement, however, only reflected that, upon finalizing the merger, the shareholders would receive instructions as to how to claim the cash to be received for their shares. This notice did not reflect the fact that no employee would be paid until his retirement or termination, as called for by the merger agreement. Plaintiffs returned the proxy cards and voted in favor of the merger. Plaintiffs never received the money they were promised, even after requesting their share after being terminated.
Plaintiffs signed their last employment contracts with Empiregas in April 1983. At the time of signing, plaintiffs were informed by an Empiregas agent, just as they had been each time they signed the earlier contracts with Empiregas, that the covenant not to compete was "not worth a damn," that the contract was "just a piece of paper," and that "it won't hold up in court."
In May 1983, plaintiffs sought other employment, and contacted J J Oil Co. in Ardmore. Plaintiffs received prospective employment with Sisco Gas, J J's plant in Huntsville. Sisco Gas is within the fifty-mile radius of Ardmore, but does not directly compete with Empiregas. Upon learning of the prospective employment, Empiregas wrote J J and informed it of plaintiffs' covenant not to compete with Empiregas for three years. Empiregas threatened to sue J J if it hired plaintiffs. *Page 247 
Based on this letter, J J decided not to hire plaintiffs.
Plaintiffs sued Empiregas and Empire, Inc., alleging wrongful interference with employment opportunities, alleging that defendants fradulently induced them to sign the employment contracts, and alleging that material information concerning the employee stock ownership plan had been concealed from them. Empire, Inc., was dismissed after showing it did no business in Alabama. Plaintiffs' actions were consolidated for trial, and proceeded against Empiregas. The jury found in favor of both plaintiffs on all counts, assessing damages for Coffman at $3,670 on the interference claim, and $29,670 on the fraud claim and for Hardy at $16,200 on the interference claim, and $70,822.15 on the fraud claim. Defendant appeals.
 I
The issue central to a decision in this case is whether there was sufficient evidence to present the question of fraud to the jury. Empiregas contends that there was not enough evidence to support instructing the jury as to fraud. We disagree. There was evidence presented to support the jury verdict finding that Empiregas both fraudulently induced plaintiffs to sign employment contracts and concealed material information concerning the merger of Empire, Inc., and Exco.
The critical elements of an action for fraud under the terms of Code 1975, § 6-5-101, are: (1) a false representation; (2) concerning a material existing fact; (3) which the plaintiff relies on; (4) to his injury, regardless of whether the representations were made wilfully, recklessly, or mistakenly.Burroughs Corp. v. Hall Affiliates, Inc., 423 So.2d 1348, 1353
(Ala. 1982). We are satisfied from the record in this case that each of these elements is present and, therefore, that the trial court correctly submitted the issue of fraud to the jury. Further, it is the function of the jury "to resolve controverted issues of fact," and where evidence is conflicting the reviewing court "will not substitute its judgment for that of the trier of facts." Goodson v. Elba Baking Co.,408 So.2d 498, 499 (Ala. 1981); Shiver v. Waites, 408 So.2d 502, 504
(Ala. 1981).
Coffman testified that when she signed her last contract with Empiregas, the following transpired:
 "A Okay. When they got there, they said, `Where is Pete and Price'? And Mr. Hardy told them that they had work to do and they had to go to Ross Poultry to work on a truck that we had put carburation on and he said, `Well, get them here.' He said, `We have got to get these contracts signed,' and Mr. Hardy said, `No, leave them here and I will get them signed and we will get them back to you.' And they said, `No, you have got to sign them today.' So, in five or ten minutes they both came in. So, they presented the new commission program very briefly, which nobody understood, and they laid these contracts out and said, `Sign them.' And we all four refused to sign them and they said, `You know what we have always told you. They are not worth a damn and it's just a piece of paper. We have got to have it on file before you get a pay check,' but we still refused to sign them. So, this one is not dated until April the 16th on the second page, Mr. Alexander.
 "Q Who told — who made the statement, `You know what we have always told you. They are not worth a damn'?
"A Mr. Bob Wooldridge did.
". . .
 "Q Had that statement, in fact, been made to you before on occasions that you would be called upon to sign one of these contracts?
 "A I imagine I had heard that statement eleven times because I had been working eleven years and I signed a contract every year.
 "Q Could you tell us some of the other persons who have made a statement such as that to you?
 "A Well, I have heard Jim Ackerman say it, I have heard Charles Ray Jones *Page 248 
say it, I have heard Paul Stallman say it numerous times.
"Q Of course, you have heard Mr. Lewter say it?
"A Yes, sir.
"Q And who hired you?
"A Mr. J.O. Lewter."
Hardy testified similarly.
J.O. Lewter, a former retail and division manager for Empiregas, who hired both plaintiffs, testified:
 "Q Was any statement made by you to them at the time that they signed their employment agreement?
"A Yes, sir.
 "Q What did you tell them with reference to that provision in the agreement?
"A I told them it wasn't worth a damn.
"Q You told them it wasn't worth a damn?
"A Yeah.
 "Q Did you, from time to time, have them sign other like agreements?
"A I did.
". . .
 "Q Were you given instructions as to what to tell these employees, Vernon Hardy and Gail Coffman?
 "A Every time I was given those contracts to get signed, the regional managers over me told me to get them signed any way I had to and to do whatever I had to do to get them signed.
"Q Whatever you had to do?
 "A Right. I was told to tell them, `It ain't worth a damn.' Just anything to get it signed.
". . .
 "Tell us, Mr. Lewter, if you would, who of your superiors gave you these instructions?
 "A Well, I was told by several of them. I can name off part of them. I had so many regional managers I can't think of all of them.
 "Q Now, each of these that you are going to name, they were your superiors?
 "A I had one who was Paul Lollis, Ron Ashcraft, Paul Pierce and Paul Stallman was the last one.
 "Q Now, tell us again what each one of those four told you with reference to your instructions in getting these employment agreements signed.
 "A They told me, `If you have to, tell them they ain't worth a damn just to get them signed.'
". . .
"Q And did you do that?
 "A Right. They had to be signed before they got their pay."
On this testimony, there was sufficient evidence to allow the jury to find that Empiregas fraudulently induced plaintiffs into signing employment contracts. Empiregas contends that the statements were not made, but that if they were, they pertained to matters of law, and not fact, and thus that the issue of fraud should not have been presented to the jury. In Best v.Best, 247 Ala. 627, 629, 25 So.2d 723, 725 (1946), this Court held:
 "`It has been said that misrepresentation or concealment as to matter of law cannot constitute remedial fraud, because everyone is presumed to know the law, and therefore cannot in legal contemplation be deceived by erroneous statements of law, and such representations are ordinarily regarded as mere expressions of opinion on which the hearer has no right to rely. Further, it has been held that a charge of fraud cannot be predicated on an honest error in a statement of the law. But misrepresentations involving a point of law will be held actionable misrepresentations of fact if it appears that they were so intended and understood as where they amounted to an implied assertion that facts existed which justified the conclusion of law expressed * * * *.'"
Quoting Clayton v. Glasscock, 221 Ala. 3, 127 So. 538 (1930).
Similarly, the Court of Civil Appeals held in Spry FuneralHomes, Inc. v. Deaton, 363 So.2d 786, 789 (Ala.Civ.App. 1978), that a misrepresentation of law constituted actionable *Page 249 
fraud where the defendant had his attorney draft a void contract and "the defendant then induced plaintiff to sign the agreement in reliance on the fact that the contract was legally binding and enforceable." In Arkel Land Co. v. Cagle,445 So.2d 858 (1983), this Court found actionable fraud where an attorney acting as the agent of the defendant intentionally misled the plaintiff lessors as to the legal effect of two mining leases in order to induce them to sign the leases.
Empiregas also contends that the misrepresentations were merely its opinion. The Court of Civil Appeals, in Jackson Co.v. Faulkner, 55 Ala. App. 354, 362, 315 So.2d 591, 598 (1975), recognized that "whether a representation is an expression of opinion or a statement of fact depends upon all the circumstances of a particular case, such as the form and subject matter of the representation and the knowledge, intelligence and relation of the respective parties." However, the form of the representation as opinion or fact "`is not in itself conclusive, and in cases of doubt the question should be left to the jury.'" Jackson Co. v. Faulkner,55 Ala. App. at 363, 315 So.2d at 599, quoting Fidelity Cas. Co. v. J.D.Pittman Tractor Co., 244 Ala. 354, 13 So.2d 669 (1943). A representation becomes a statement of fact "`[w]henever a person states a matter which might otherwise be only an opinion, not as a mere expression of his own opinion but as an existing fact material to the transaction, so that the party may reasonably treat it as a fact.'" Jackson Co. v. Faulkner,55 Ala. App. at 363, 315 So.2d at 599, quoting Fidelity Cas.Co., supra.
The evidence presented at trial tended to show that agents of Empiregas told plaintiffs the noncompetition provisions "were not worth a damn" in order to induce plaintiffs to sign the contracts. Further, the evidence showed that they acted under instructions from superiors. Plaintiffs testified that they would not have signed the contracts if they believed the covenants not to compete were valid. Therefore, the jury could have determined, as it did, that Empiregas fraudulently induced plaintiffs to sign the contracts.
There was also evidence to support the finding that Empiregas fradulently concealed the effect of the merger on plaintiffs' shares of stock in Empire, Inc. Hardy testified that a meeting was held with Paul Stallman in February 1983:
 "A Okay. At this particular meeting — it was at the Holiday Inn in Huntsville, Alabama, and I believe it was in the latter part of January or the first part of February and he told us at that meeting that we would be receiving, in the mail, one of these stock books along with a letter and a proxy card to vote and he said, `We are asking everybody to vote yes for Empire to sell out. After you send that proxy card in, if you vote yes, you will receive twenty-two dollars per share for your stock within sixty days.'
"Q Did you sign the card that they asked you to sign?
"A Yes, sir, I did.
 "Q Did you receive the twenty-two dollars in cash within sixty days?
"A No, sir, I haven't received it yet."
Further, the 140-page prospectus regarding the merger which was mailed to the shareholders along with their proxy cards, does not mention the fact that disbursement of funds was to occur only upon the employee's retirement or termination. Only one paragraph, on page 39, reveals that the employees did not have an immediate right to the funds. That paragraph states:
 "Upon consummation of the Merger, each of the 141,826 shares of Common stock held in the Company's Employee Stock Ownership Plan (the `Plan') will be converted into the right to receive $22.00 in cash and $9.00 principal amount of New Debentures. The assets held by the Plan after the Merger will not be distributed to participants in the Plan. Instead, the Surviving Corporation will cause the Plan to become a qualified profit-sharing plan, and the cash and New Debentures received in the Merger will become the assets of the new plan. The interests of *Page 250 
participants in the Plan will be properly reflected as participating interests in the new plan. It is not anticipated that participants in the Plan will realize income as a result of the cash and New Debentures being paid for shares of Common Stock held by the Plan or the conversion of the Plan into a profit-sharing plan."
However, Stallman testified that his understanding of the effect of the merger was different:
 "A There was a question asked to me by one of my retail managers in regards to the merger and what I knew that was going on about it. I merely told them, `I doubt if I know any more about it than you do. I do not know if it is going through or not but I will tell you what I know.' Before I got started, there was a question by somebody that asked me what was going to happen with their retirement program and the stock they had and so forth and I told them, `I am just a dumb old farm boy from Missouri but I will try to explain it to you the best way I can.' I said, `According to what I have been told, you will receive twenty-two dollars a share and a nine dollar debenture and this will be put back into your retirement program for when you retire or when you leave the company.' That's all I knew about it. I didn't know anything else about it."
This conflict in the testimony raised an issue for the jury to resolve. The trial court, therefore, was correct in presenting the issue of fraud to the jury.
 II
Empiregas also contends that plaintiffs' theory of wrongful interference with plaintiffs' employment opportunities should not have been presented to the jury because it was merely pursuing its legal rights under the contracts. In Polytec, Inc.v. Utah Foam Products, Inc., 439 So.2d 683, 689 (Ala. 1983), this Court stated:
 "One's employment, trade, or calling is a property right, and the wrongful interference therewith is an actionable wrong. Moving Picture Machine Op. Local No. 236 v. Cayson, 281 Ala. 468, 205 So.2d 222
(1967); Bowen v. Morris, 219 Ala. 689, 123 So. 222
(1929). `[A]n unlawful invasion of or interference with the pursuit or progress of one's trade, profession, or business is a wrong for which an action lies.' Sparks v. McCreary, 156 Ala. 382, 387, 47 So. 332 (1908); Alabama Power Co. v. Thompson, 278 Ala. 367, 178 So.2d 525 (1965).
 "The question of whether defendants were justified in taking the actions interfering with a plaintiff's business is generally for the jury to decide. Evans v. Swaim, 245 Ala. 641, 18 So.2d 400 (1944). Furthermore, justification is an affirmative defense. Sparks v. McCreary, supra; see also, Thompson v. Allstate Ins. Co., 476 F.2d 746 (5th Cir. 1973)."
In Thompson, the defendant contended that the plaintiff's complaint was deficient because it did not allege that the defendant acted without justification. The Fifth Circuit Court of Appeals held:
 "Our reading of Alabama law discloses no such requirement. Instead, as we read the cases, they have consistently held that, prima facie, a cause of action for intentional interference with another's business is established by showing: (1) an intentional act of interference and (2) some consequential harm to the plaintiff's business. See Sparks v. McCreary, supra; Carter v. Knapp Motor Co., [243 Ala. 600, 11 So.2d 383 (1943)] Kelite Products v. Binzel, 5 Cir. 1955, 224 F.2d 131. Justification for interference in another's business is an affirmative defense and is no part of the plaintiff's case. It `is enough to allege and prove the conduct and effect, leaving the defendant to justify if he can.' American Well Works Co. v. Layne Bowler Co., 1916, 241 U.S. 257, 259, 36 S.Ct. 585, 586, 60 L.Ed. 987 (Holmes, J.)."
Thompson v. Allstate Ins. Co., 476 F.2d at 748.
Empiregas's contention that it acted pursuant to its legal rights is evidence of its attempt to justify its actions, but is not conclusive of the issue. The *Page 251 
burden is upon Empiregas to prove that its actions were justified. Here, the jury, having found that plaintiffs' contracts with Empiregas were fraudulently induced, invalidated Empiregas's justification.
 III
Empiregas also contends that it was error for the trial court to permit plaintiffs' attorney to cross-examine Larry Ellison regarding his interest in Empire, Inc. Empiregas contends that Empire, Inc., was not the defendant in this case, and thus, that his interest was irrelevant. However, Ellison testified on direct examination that he was a senior vice president of Empire, Inc., and that his duties included administering the financial affairs of all subsidiaries of Empire, Inc., including Empiregas. Ellison testified on direct examination that he felt the merger was good for the shareholders and that he had informed them of this fact. On cross-examination, questioning revealed that the sale of Ellison's stock in Empire, Inc., resulted in a personal profit of over $440,000.
The trial court held that this line of questioning was proper because it revealed any bias Ellison might have. It is in the trial judge's discretion to determine whether facts tending to show bias or interest should be admitted into evidence. Osbornev. Cobb, 410 So.2d 396, 398 (Ala. 1982). Generally, counsel is given wide latitude to reveal any bias on the part of a witness on cross-examination. International Union, United Automobile,Aircraft Agricultural Implement Workers v. Russell, 264 Ala. 456,472, 88 So.2d 175, 188 (1956). Ellison's personal interest in Empire, Inc., increased substantially as a result of the merger between Empire, Inc., and Exco. We feel that the trial judge did not abuse his discretion by allowing plaintiffs' counsel to question Ellison regarding his interest in Empire, Inc., especially in light of Ellison's direct examination testimony, which opened the door for plaintiffs' cross-examination.
 IV
Empiregas also contends that the trial judge did not make available to counsel the written interrogatories propounded to the jury prior to final arguments, as required by Rule 49 (d), Ala.R.Civ.P.
Plaintiffs' counsel strongly contests this argument. Further, this Court will not assume error, and the burden is on the appellant "to affirmatively demonstrate from the record that an error was committed by the trial court." Chestnut Hills CivicAss'n v. Dobbins, 361 So.2d 1043, 1044 (Ala. 1978); CoastalRealty Mortg., Inc. v. First Ala. Bank, N.A., 424 So.2d 1315,1317 (Ala.Civ.App. 1982). An appellate court "cannot presume the existence of facts as to which the record is silent and make it a ground for reversal." Davis v. State ex rel. Davis,420 So.2d 278, 279 (Ala.Civ.App. 1982). Appellate courts are "prisoners of the record and occurrences in chambers and off the record are outside [the court's] purview unless the trial court or attorneys made certain that [the court] is privy to them." Stephens v. Central of Georgia R.R. Co., 367 So.2d 192,194 (Ala. 1978). The trial court is presumed to have acted correctly "unless the contrary is made to appear from the record." Johnson v. Fishbein, 289 Ala. 328, 334, 267 So.2d 405,410 (1972). In order to properly preserve this question for our review, Empiregas's counsel should have objected to the giving of these interrogatories to the jury. He was presented with an opportunity to do that after the judge instructed the jury, yet he failed to do so. In Elliott v. Elliott, 372 So.2d 846, 848
(Ala. 1979), this Court held in an analogous situation that where the appellant does not object to the trial court's failure to inform the attorneys of its proposed action on requested jury charges as required by Rule 51, Ala.R.Civ.P., no error is preserved for review. Here, counsel for Empiregas was presented the opportunity to state any objections he had to the charge as given, which contained the written interrogatories, at the end of the jury charge. He failed to do so. Therefore, there is nothing for this Court to review on this issue. *Page 252 
 V
Finally, Empiregas contends that the damages are excessive because the trial court improperly instructed the jury as to awarding punitive damages and the jury did not consider plaintiffs' duty to mitigate their damages. First, Empiregas made no objection to the trial judge's charge on punitive damages; thus, any objection it may have had is waived. LochRidge Construction Co. v. Barra, 291 Ala. 312 at 320,280 So.2d 745 at 751 (1973); William Wilson Enterprises, Inc. v. Napier,395 So.2d 89, 90 (Ala.Civ.App. 1981).
As to Empiregas's claim that the jury did not properly consider the plaintiffs' duty to mitigate their damages, we note that the trial court properly charged the jury regarding that duty. Empiregas contends that the judge's instructions were ignored by the jury; however, error will not be presumed on appeal, and "a party cannot be permitted to speculate on the results of a court's instruction or claim error with regard thereto without an affirmative showing that such an instruction was ignored by the trier of fact or caused an improper verdict." Citizens Bank v. Routh, 351 So.2d 594, 597
(Ala.Civ.App. 1977). We are of the opinion that no such showing has been made on the facts presented.
The judgment of the Circuit Court of Limestone County is affirmed.
AFFIRMED.
TORBERT, C.J., and JONES, SHORES and HOUSTON, JJ., concur.