This case involves claims by the plaintiffs based on alleged fraud and breach of the warranty of habitability of a new house; the case arises out of the purchase of a new house in Fort Deposit, Alabama. Robert Dwayne and Elizabeth H. Bozeman sued John and Peter Norman and their wives, Genie and Delnora Norman, individually. They later amended their complaint to add as a defendant Norman Properties, a partnership composed of John and Peter Norman. The complaint requested compensatory damages as well as damages for mental and emotional anguish.
The jury returned a verdict against Norman Properties in the amount of $50,000. The jury found for the four individual defendants. Judgment was entered on this verdict. Norman Properties filed a motion for JNOV or, alternatively, for new trial or a remittitur. The trial judge denied that motion. Norman Properties appeals.
The Bozemans purchased a house from the Normans in December 1983 for $46,000. The deed conveying the lot to the Bozemans was executed by the four Normans but contained no reference to Norman Properties. However, the receipt given to Mrs. Bozeman for the down payment was signed "Norman Properties by 'Pete' Norman." The sales contract also indicated that the house was "constructed by Norman Properties." The trial testimony revealed further facts regarding this point, which are detailed below.
The Normans began building houses in Ft. Deposit on speculation. They had had no prior experience in building houses, and they had another contractor, Mike Norman (apparently no relation to the Normans in this case), actually build this particular house for them. The Normans' participation in the building and sale of the house consisted of securing the lot, selecting and reviewing the plans and specifications, coordinating the interior colors, inspecting the building site from time to time during construction, and ultimately signing the deed to the Bozemans. Both John and Peter Norman represented to the Bozemans that the home was "well built" and was an "Alabama Power good sense" [sic] home.
The Bozemans took possession of the house in December 1983 and first began to see minor problems in January or February 1984. The initial problems involved the heating system and drainage in the yard. Because the house was completed in the winter, the yard had not been graded or sodded, and rainwater would drain into the yard from the street and stand in the yard. Trial testimony revealed that even after the yard was landscaped, Mr. Bozeman had to install a "french drain" to keep the water from flowing toward and under the house. The heating unit was repaired after a repairman discovered a manufacturing defect.
Further problems developed during 1984 and 1985, including mildew on the windowsills, "hairline" cracks in the bathroom tile floors, cracks in the sheetrock walls, failure of the front door to close properly, and *Page 1267 
cracks in the driveway. The siding on the house began to loosen, and the boards appeared to be warping outward. The kitchen floor appeared dirty even after being cleaned. The testimony by Mrs. Bozeman is not specific as to the date on which each problem occurred. It appears that in the latter part of 1984 or early in 1985 the Bozemans also discovered that the rear patio had been constructed partially over an open well. They attempted on several occasions to fill the well, but each time the fill settled and the hole opened again. It also appears from the record that in 1985 or 1986, Mr. Bozeman had to attempt to repair a clogged drain.
Finally, in November 1986, the Bozemans employed the professional engineering firm of Joseph and Spain to inspect their house. At trial, Mr. Joseph was offered as an expert, without objection. He testified that his inspection in November or December 1986 revealed that the turn-down of the footing of the outer support walls was insufficient. He said that the turn-down should have been from three to five feet deep due to the fact that the house had been built on prairie soil, but that it was only one foot deep. He further testified that the concrete used in the foundation of the house was inferior and that at some points he could crumble the concrete in his hands.
Mr. Joseph also testified that the front stoop and the rear patio had settled. His report indicated "the quality of the concrete in the drives, patio and entrance slab all seem to be of a low quality [and] since part of the roof on the front entrance slab and over the patio is supported by a wood post, bearing on these slabs, any movement of the slab can have adverse effects on the structure." One of the posts supporting the roof had become completely unattached from the house. He said that the main slab on which the house was built also had abnormal cracking, and that moisture seeped through the floor, causing the kitchen floor to appear "dirty," even after cleaning, and causing the living room carpet to stay damp.
Mr. Joseph further testified that the windows were incorrectly installed, and that the incorrect installation caused moisture to collect on the windows and, in turn, to cause mildew on the windows. He also testified that the structural defects were present when the house was built but would not have been discovered by normal observation.
After receiving Mr. Joseph's report, the Bozemans said, they decided the house was uninhabitable. They said they were afraid that the sinking of the concrete slabs would cause the gas line to break. They also said they could not unclog the drain that was causing a sewage backup. During the spring of 1987, the drains from the bathrooms and the dishwasher again became clogged. In attempting to remedy these clogs, Mr. Bozeman had to dig up the yard to reach the pipes. His testimony indicated that the problems occurred because the pipes that had been installed were too small. This was the second time the drains had clogged, and on this occasion, sewage backed up into the house and covered the floors, including the living room carpet.
Mr. Joseph testified that it would be cost-prohibitive to correct the foundation problem. In February or March 1987, the Bozemans ceased making mortgage payments, believing the house to be worthless, they said, and they subsequently abandoned the property.
The lender foreclosed and purchased the property for $47,832.02. Mary Amos, a real estate broker, testified that, following the foreclosure sale, she listed the property for sale. At the time of trial, in August 1988, there was a contract on the house for $48,000.00. Ms. Amos testified that no major repairs had been made to the house since the foreclosure. She said she had made a "walk-through" inspection of the house and from that inspection was not aware of any structural defects. She said that the prospective purchasers had not been made aware of any defects.
Ann Carmichael, a real estate appraiser who had done an appraisal of the property, also testified that she was not aware of any *Page 1268 
structural defects. She testified, however, that any structural defects, such as those testified to by Mr. Joseph, would lower her appraisal to some extent, depending on whether they were curable and, if so, the cost of curing them.
Mrs. Bozeman testified that she and her husband had paid approximately $25,000.00 in mortgage payments, for closing costs, for the down payment, for yard work, for installation of a utility shed and a privacy fence, and for relocating expenses.
 Issues
Norman Properties, the partnership, raises three issues on appeal. First, it contends that the Bozemans' fraud claim was barred by the applicable statute of limitations. Second, it claims that it was entitled to a judgment notwithstanding the verdict because the jury rendered a verdict only against it and not against its individual partners. Third, it contends that the jury's verdict of $50,000 was excessive in light of the evidence.
 Statute of Limitations
There was evidence that the partners represented to the plaintiffs that the house was "well built" while knowing that it was not. Thus, the evidence would support a verdict based on fraud. See Deupree v. Butner, 522 So.2d 242, 245-46 (Ala. 1988); see also Hickox v. Stover, 551 So.2d 259, 263 (Ala. 1989).
Norman Properties contends, however, that the Bozemans' fraud action was barred by the statute of limitations. It raised this defense by a motion made during the trial to amend the pleadings to conform to the evidence. Norman Properties then moved for a directed verdict on this defense, which was denied, although the amendment had been allowed. Norman Properties contends that the trial judge should have found the fraud count barred as a matter of law or should have allowed the jury to determine whether the count was time-barred.
Norman Properties also contends that the judge erred in not charging the jury on the statute of limitations issue. While counsel for Norman Properties did object at trial to the omission of a statute of limitations charge, he did not state the grounds for his objection and cannot now claim this omission as error. A.R.Civ.P., Rule 51.
Under Ala. Code (1975), § 6-2-38 (Cum.Supp. 1988), an action for fraud is subject to a two-year statute of limitations. However, § 6-2-3 provides:
 "In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action."
This provision has been interpreted as follows:
 "Fraud is deemed to have been discovered when the person either actually discovered, or when the person ought to or should have discovered, facts which would provoke inquiry by a person of ordinary prudence, and, by simple investigation of the facts, the fraud would have been discovered."
Gonzales v. U-J Chevrolet Co., 451 So.2d 244, 247 (Ala. 1984); citing Papastefan v. B L. Construction Co., 385 So.2d 966
(Ala. 1980); Johnson v. Shenandoah Life Ins. Co., 291 Ala. 389,281 So.2d 636 (1973); see also Bank of Red Bay v. King,482 So.2d 274 (Ala. 1985). Stated another way, the test for determining whether the fraud action is timely filed is:
 " 'Whether, within [two] year[s] prior to filing suit, plaintiff had [first acquired] knowledge of such facts, or knowledge of facts which would lead a reasonable man to make diligent inquiry which would have enabled plaintiff to discover the fraud alleged. . . .' "
McLaughlin v. Pannell Kerr Forster, 504 So.2d 264, 265 (Ala. 1987), quoting State Security Life Ins. Co. v. Henson, 288 Ala. 497,504, 262 So.2d 745, 751 (1972). (Emphasis original.)
 "This Court has decided that under certain circumstances the time of the discovery *Page 1269 
of the fraud or the time the fraud should have been discovered can be determined as a matter of law. In so determining, this Court does not make delphic pronouncements, but has before it either uncontroverted evidence that plaintiffs had such notice, Davis v. Davis, 494 So.2d 393 (Ala. 1986); Kelly v. Smith, 454 So.2d 1315 (Ala. 1984); Retail, Wholesale Department Store Employees Union, Local 453 v. McGriff, 398 So.2d 249 (Ala. 1981); Moulder v. Chambers, 390 So.2d 1044 (Ala. 1980); Seybold v. Magnolia Land Co., 376 So.2d 1083 (Ala. 1979), or uncontroverted evidence that a plaintiff, with the ability to read, had in his/her possession a document from which the fraud could have been ascertained by a simple investigation, Colafrancesco v. Crown Pontiac-GMC, Inc., 485 So.2d 1131 (Ala. 1986); Cooper Chevrolet, Inc. v. Parker, 494 So.2d 386 (Ala. 1985); Gonzales v. U-J Chevrolet Co., supra; Sexton v. Liberty National Life Ins. Co., 405 So.2d 18 (Ala. 1981)."
McLaughlin, 504 So.2d at 265.
The complaint in this action was filed on December 9, 1986. The record shows that certain minor problems, such as the dirty appearance of the kitchen floor, the mildewed windows, the cracked driveway and the outside drainage problems were apparent soon after the Bozemans took possession of the property. However, the settling of the main concrete slab, the front porch, and the rear patio occurred over time. The significance of that settling was determined by Mr. Joseph during his investigation in November or December 1986. There was testimony that this settling of the slabs caused the porch posts to be pulled away, the inside walls to crack, and the front door not to close properly. The record also reveals that during 1985 or 1986 the drains clogged and that in 1987, sewage backed up into the house. All of these later, obvious problems occurred well within two years of the date the complaint was filed.
The plaintiffs here did not know the cause of the problems until Mr. Joseph inspected the property in November or December 1986. The Bozemans used the information obtained from Mr. Joseph as the basis upon which to file their complaint. The initial problems experienced by the Bozemans would not have caused a reasonable person to question the grade of concrete used in the foundation of the house. Mr. Joseph's testimony showed that a lay person would not be able to discover the problems he discovered. The Bozemans sought legal advice immediately after receiving Mr. Joseph's report and filed suit within a month. We need not determine whether the limitations period allowed by § 6-2-3 began to run when the plaintiffs got Mr. Joseph's report informing them of the cause of the problems, or began to run when they learned of the problems themselves, since they sued within two years of that earlier event. The trial court did not err in overruling Norman Properties' motion for a directed verdict or its motion for JNOV.
 Verdict Against the Partnership
The verdict was against Norman Properties, but not against the Normans individually. Norman Properties contends that this verdict is inconsistent and that the trial judge therefore should have granted its motion for JNOV. Because the jury did not find the individual partners liable, Norman Properties contends, it could not possibly find the partnership liable. The partnership also contends, because there was no written partnership agreement, that it was not a formal partnership and, consequently, that it was not effective as to third parties.
Alabama has adopted the Uniform Partnership Act, codified at Ala. Code (1975), § 10-8-1 et seq. Under the Alabama act, a "partnership" is defined as an "association of two or more persons to carry on as co-owners a business for profit." § 10-8-2(7); see Adderhold v. Adderhold, 426 So.2d 457, 459
(Ala.Civ.App. 1983); 59A Am.Jur.2d Partnership, § 2, p. 234 (1987). Whether a partnership exists is also determined from the "community of interest which includes the right to manage *Page 1270 
and control the business." Adderhold, supra, at 459; see 59 Am.Jur. Partnerships §§ 42-44 (1971). While we have held previously that " 'a partnership arises only from an express or implied agreement among the parties and is never established by implication or operation of law,' " the surrounding circumstances can evidence the intention of the parties to establish such a relationship. Adderhold, 426 So.2d at 459, quoting Waters v. Union Bank of Repton, 370 So.2d 957 (Ala. 1979).
Further, the Alabama Partnership Act states:
 "Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partners. . . ."
Ala. Code 1975, § 10-8-49.
The Alabama Code also contains a "common name" clause:
 "Two or more persons associated together as partners in any business or pursuit who transact business under a common name, whether it comprises the names of such persons or not, may be sued by their common name in all civil actions, whether hitherto denominated as legal or equitable in nature; and the judgment in the action binds the joint property of all the associates in the same manner as if all had been named defendants, had been sued upon their joint liability and served with process. Any one or more of the associates, or their legal representatives, may also be sued for the obligation of all."
Ala. Code (1975), § 6-7-70. (Emphasis added.) It is established by statute and supported by common law in this state that a judgment against the partnership, and not against the partners, attaches only to the partnership assets and not to the property of the individual partners. Baldridge v. Eason, 99 Ala. 516,13 So. 74 (1893); see also Duncan, Inc. v. Head, 519 So.2d 1305,1308 (Ala. 1988) (Almon, J., concurring specially); Prado NorthResidences, Ltd. v. Prado North Condominium Association, Inc.,477 So.2d 396, 399 (Ala. 1985); Woodfin v. Curry, 228 Ala. 436,437, 153 So. 620 (1934); Ratchford v. Covington County,172 Ala. 461, 55 So. 806 (1911).
In the case at hand, the plaintiffs' initial complaint listed only the Normans individually. After discovery, the plaintiffs amended their complaint to include the partnership as a defendant. The individual defendants remained parties to the suit in their individual capacities, outside the realm of anypartnership activities. The trial judge submitted to the attorneys a form for the verdict, to which the parties raised no objections. The form submitted to the jury allowed two possibilities: 1) that the actions complained of were committed by the Normans in their individual capacities, or 2) the wrongs committed were in the line and scope of the partnership activities, obligating the partnership.
The jury decided that the partners were liable in theirpartnership capacity. The jury obviously concluded that the liability was a partnership obligation rather than an obligation outside the line and scope of the partnership activities. Although we find no inconsistency, we note that, because the defendants made no objection to the choice presented to the jury in the verdict form, and made no objection to the verdict before the jury was discharged, any objection here to any possible inconsistency has been waived. See Ford v. Canton, 530 So.2d 217, 222-23 (Ala. 1988); andEmpiregas, Inc. of Ardmore v. Hardy, 487 So.2d 244, 251 (Ala. 1985); see also Stancill v. McKenzie Tank Lines, Inc.,497 F.2d 529, 534 (5th Cir. 1974) ("[b]y failing to object to the form of the verdict and answers at the time they were announced by the jury, both parties waived any objections to inconsistencies").
We are also mindful of the case of R. L. Turner Motors v.Hilkey, 260 Ala. 577, 72 So.2d 75 (1954), decided prior to the adoption of the Uniform Partnership Act. That case involved three separate actions against a partnership and its partners individually. In each case, a judgment was entered against the partnership and in favor of each of the individual defendants. *Page 1271 260 Ala. at 579, 72 So.2d at 77. We held that the verdict was fatally inconsistent and ordered a new trial. To the extent that R. L. Turner Motors conflicts with our holding today, it is expressly overruled.
The trial court properly denied Norman Properties' JNOV motion.
 Alleged Excessiveness of the Verdict
Norman Properties insists that the verdict of $50,000 was excessive. It contends that the trial judge erred in not ordering a new trial or remitting a substantial portion of the verdict.
There are two methods of determining damages in a case involving the breach of the warranty of habitability. Lowe v.Morrison, 412 So.2d 1212, 1213 (Ala. 1982). The reasonable cost of the repairs is the first measure of damages available, if the correction of the defects would not constitute waste.United States Fidelity Guaranty Co. v. Jacksonville StateUniversity, 357 So.2d 952, 957 (Ala. 1978). Here, Mr. Joseph testified that there was no way to correct the structural defects he found that would not constitute waste. In other words, the cost of necessary repairs would far exceed the value of the house.
The second method of determining damages is the "difference in the reasonable market value of the house in its condition at the time it was purchased and the reasonable market value of the house as it would have been had the house been constructed substantially according to the contract or warranty."Crocker v. Reed, 420 So.2d 285, 286 (Ala.Civ.App. 1982), citing Hubbard Brothers Construction Co. v. Brackner,390 So.2d 648 (Ala.Civ.App. 1980).
Mrs. Bozeman testified that the lot and the house were purchased for $46,000.00. She also testified that they had paid $25,000 in mortgage payments, and additional sums for closing costs, for the downpayment, for yard work, for installation of a utility shed and a privacy fence, and for relocating expenses. She testified that the house is now worthless because of the defects, which the evidence indicates cannot be economically corrected. Mrs. Bozeman is qualified to offer an opinion as to its market value. Mobile Home Brokers, Inc. v.Clark, 346 So.2d 1156, 1159 (Ala.Civ.App. 1977). Mrs. Bozeman also gave testimony that supported the Bozemans' claim for damages for mental and emotional anguish.
Norman Properties introduced evidence as to the current market value of the house. AmSouth Bank purchased the property at the foreclosure sale for $47,832.02. There is no evidence in the record indicating whether the bank knew of the defects in the house. A professional appraiser, on December 31, 1987, estimated the market value of the house to be $47,000. She testified, however, that when she made that appraisal she was not aware of the defects that Mr. Joseph had found. At the time of the trial, someone had entered a contract to purchase the house for $48,000. The testimony by the real estate salesperson indicated that the prospective purchasers had seen the property once, but that they were not aware of the defects that Mr. Joseph said he had found.
It was for the jury in this case to determine the credibility of the witnesses. Jury verdicts are presumed to be correct and will not be disturbed on appeal unless they are clearly wrong and unjust. Campbell v. Burns, 512 So.2d 1341, 1343 (Ala. 1987). Further, where there is some evidence to support a jury's verdict, the motion for a directed verdict, and thus also a motion JNOV, is properly denied. Id.; Turner v. PeoplesBank, 378 So.2d 706 (Ala. 1979). The evidence well supports a verdict based on breach of the warranty of habitability. Likewise, the evidence supports a verdict based on fraud; there was evidence that each of the parties represented to the plaintiffs that the house was "well built," when they had good reason to know it was not. The verdict was well within the range of damages that would have been supported by the evidence, particularly considering the evidence of emotional distress. See B M Homes v. Hogan, 376 So.2d 667, 671 (Ala. 1979). *Page 1272 
For the foregoing reasons, we affirm.
AFFIRMED.
JONES, ALMON, SHORES, ADAMS, HOUSTON, STEAGALL and KENNEDY, JJ., concur.
MADDOX, J., not sitting.