593 So.2d 989 (1991)
Thomas Calvin SMITH
v.
Gordon REDD.
No. 89-CA-0476.
Supreme Court of Mississippi.
December 11, 1991.
Rehearing Denied March 18, 1992.
*991 T. Mack Brabham, McComb, for appellant.
Richard E. Stratton, III, Brookhaven, for appellee.
Before DAN M. LEE, P.J., and PRATHER and BANKS, JJ.
PRATHER, Justice, for the Court:
This appeal and cross-appeal arose from a dispute in the Lincoln County Chancery Court over the existence (or non-existence) of a partnership in a sawmill and pallet-making operation. Thomas Calvin Smith asserted a partnership interest in the business known as Industrial Hardwood Products of Brookhaven, Mississippi, along with Gordon Redd. The chancellor found that no partnership existed between the two men; however, he awarded Smith an equitable sum of money for his contribution to the business. This Court agrees with the chancellor's conclusion that Smith contributed to the business; however, this Court reverses the chancellor in his conclusion of law that the business arrangement was not a partnership and remands for a determination of the percentage of interest.

I.
In 1977 Thomas Calvin Smith and Jackie Lea, were partners in their own logging business, known as L & S Logging. In January 1981, they were approached by Gordon Redd about "going into business together" and running a sawmill. Redd had started getting the business together, but was in need of help to get the mill built and operating. Smith and Lea knew nothing of the sawmill business, but Redd agreed to train them to operate the mill. Redd also agreed to manage the financial matters. No formal written instrument was produced by the three men to evidence this agreement.
Smith and Lea discontinued their logging partnership and joined Redd at the sawmill operation. They brought all of their logging equipment  a knuckleboom loader, trailer, diesel tank, saws and tools  to the mill site and began working to get the mill operating. Smith hauled gravel from his father's land for the mill yard and worked to construct the mill shed. The mill eventually became operational and expanded to include a pallet operation. The operation became known as Industrial Hardwood Products (IHP).
In February 1983, Lea became dissatisfied and left the operation. Redd paid him a lump sum of money on his departure. Smith remained with the operation and gradually began to feel insecure with the nature of the relationship between him and Redd. In September 1986, Smith asked Redd to reduce to writing the agreement into which they entered in 1981. Redd did not produce a writing and, in February 1987, Smith left the operation.
In April of 1987, Smith filed a complaint in the Chancery Court of Lincoln County alleging that he, Lea, and Redd had formed a partnership agreement under Miss. Code Ann. § 79-12-1, et seq. (1972) and that he had acquired all the rights and privileges of a partner in the sawmill operation, including the right to petition for dissolution and be paid his value of the partnership interest. In the alternative, Smith alleged that he had detrimentally relied on the representations made to him by Redd in 1981, suffering actual damages of the loss of business opportunity, loss of income, mental pain and suffering, out-of-pocket expenses, and other damages. Smith also requested punitive damages on the basis that Redd's actions were willful, wanton, or malicious, or made in reckless disregard of Smith's rights and sensibilities. Smith sought total damages of $1,000,000.00.
In his answer Redd denied that any partnership agreement was formed with Smith and Lea, and that they never did business as IHP. Smith amended his complaint to assert that, regardless of the outcome of the other matters, he was entitled to $70,000.00 from Redd for services rendered in starting the mill. Redd denied this assertion and additionally alleged that the claim was barred by the statute of limitations or, if any partnership had existed, it was dissolved by Lea.
*992 On December 3, 1987, the trial commenced. The chancellor first considered the issue of creation of a partnership; he then considered, assuming that no partnership was formed, whether detrimental reliance was evidenced and damages warranted. The evidence surrounding the first issue was disputed. At trial Smith testified he was of the belief the three men, Smith, Lea and Redd, had formed a partnership. He contended that, during the initial meeting, there was discussion of percentages of interests to be held by each of the three men in the business, with Redd offering to Smith and Lea whatever interest in the business they wanted after the bank was paid off and Redd had recouped his investment money.
As noted, no written agreement on the specific percentages of interest to be held by each man exists. However, a tape recording in which Redd mentions that he believes Smith was entitled to a one-third interest exists. Smith and Lea both received $300.00 a week as compensation for their work, which was reported on a federal W-2 form as wages with social security and tax withholdings and workers' compensation benefits. Smith testified that all three had the authority to make decisions at the mill and hire and fire employees. No partnership return was filed for IHP. Occasionally, however, cash money was split among the three (or after Lea left, between the two) men. Smith testified that Redd offered him $70,000.00 to dissolve the partnership. Smith and Lea had not been obligated to invest any money in IHP nor liable for any losses that IHP might suffer. Redd did not draw any wages from IHP, but did withdraw money from the business. Smith and Lea's equipment was used by IHP, and they received no compensation for its use. Lea testified that he understood the arrangement among the three of them to be a partnership. He also stated that there was no discussion on forming a corporation during the original discussion of going into business.
Redd testified that he offered Smith and Lea an opportunity to learn the sawmill business because he needed someone to run the mill. He informed them of loans owed to the bank. He additionally explained that, when the bank note was paid and when he recouped his investment, the men would form a corporation and Smith and Lea could have whatever interest that they wanted. Redd discussed business decisions, such as the purchase of an office and the construction of the pallet shed, with Smith and Lea. Smith and Lea also had check-signing authority. The relationship of the three appeared to others to be a partnership. Trade magazines listed Redd and Smith as "co-owners."
Smith rested his case, and Redd requested a directed verdict on the issue of liability asserting that Smith failed to establish by clear and convincing evidence that a partnership existed. The trial court granted the directed verdict on the issue of liability, but found that there was a showing of an equitable interest held by Smith and that there needed to be a hearing to determine the value of that interest.
Extensive evidence was introduced by both Redd and Smith, by means of documents and expert testimony as to the value, expenses, and liabilities of the mill. Employees of IHP testified that Redd owned the mill, that Smith was an employee, and that they did not believe that Smith owned an interest in IHP. Smith acknowledged that he and Lea were told that they would take an interest in the operation after the bank was paid and Redd got most of his money back. Smith and Lea hauled some 480 loads of gravel, valued at $26,000.00, to the mill, for which they were not reimbursed. Redd acknowledged he owed someone for the gravel and that he owed rent, valued at $8,000.00, for the use of the knuckleboom loader.
At the conclusion of the trial on June 29, 1988, the trial court ruled that there was no partnership, no fraud, and no basis for punitive damages, that Lea and Smith were employees, and that Redd was the employer. He held that the three men did form an agreement, but the agreement provided that as soon as the bank was paid off and Redd was repaid his investment Lea and Smith would be given an interest in the mill. Because Redd was still in debt, *993 "nothing was owed" to Smith. The trial court held, however, that it would be inequitable to "send ... Smith ... away empty-handed, and taking into consideration his time in his employment at [IHP]," Smith was awarded $50,000.00.
The chancellor held that Smith was entitled to receive from Redd $50,000.00 compensation for his half interest in the knuckleboom loader ($16,000.00), for the rent on the previous use of the loader ($8,000.00), and for the gravel that Smith hauled to the mill ($26,000.00).
Smith appealed and presented the following issues which warrant discussion: (1) the chancellor erred in holding that he was not a partner and (2) assuming that there was no partnership, the chancellor erred in his measure of damages for his "equitable interest" by not considering or awarding the difference between what Smith could have made logging between 1981 and 1986 and what he actually made working for IHP. Redd cross-appealed, asserting that the chancellor erred in making a monetary award to Smith because the statute of limitations had run and because such relief was not requested in the complaint.

II. DIRECT APPEAL
This Court's standard of review of the findings of a chancery court is limited by the manifest error-substantial evidence rule, which is generally applicable when reviewing the findings of a trial judge sitting without a jury. Croenne v. Irby, 492 So.2d 1291, 1294 (Miss. 1986).
Smith asserts that the trial court erred in finding that no partnership existed between himself and Redd. A partnership as defined by statute is "an association of two (2) or more persons to carry on as co-owners a business for profit." Miss. Code Ann. § 79-12-11 (1972). The determination of whether a partnership exists is governed by statute. Miss. Code Ann. § 79-12-13 (1972) states:
§ 79-12-13. Rules for determining the existence of a partnership.
In determining whether a partnership exists, these rules shall apply:
(1) Except as provided by section 79-12-31 persons who are not partners as to each other are not partners as to third persons.
(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or party ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property.
(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.
(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:
(a) As a debt by installments or otherwise,
(b) As wages of an employee or rent to a landlord,
(c) As an annuity to a widow or representative of a deceased partner,
(d) As interest on a loan, though the amount of payment varies with the profits of the business,
(e) As a consideration for the sale of the goodwill of a business or other property by installments or otherwise.
(5) Operation of a mineral property under a joint operating agreement does not of itself establish a partnership.
These statutes codified the common-law rules of partnership. Hults v. Tillman, 480 So.2d 1134, 1144 (Miss. 1985). However, the common law is still used to supplement the statute in determining when a partnership exists. Generally, a partnership exists when two or more persons join together with their money, goods, labor, or skill for purposes of carrying on a trade, profession or business with a community interest in the profits and losses. Weizer v. Commissioner of Internal Revenue Serv., 165 F.2d 772, 776 (6th Cir.1948); see also Hults, 480 So.2d at 1146 (involving *994 a determination of whether a joint venture, which is a partnership for a specific purpose, existed); Blaustein v. Lazar Borck & Mensch, 161 A.D.2d 507, 555 N.Y.S.2d 776 (1990). The three main questions that are considered in partnership determination are (1) the intent of the parties, (2) the control question, and (3) profit sharing. H. Reuschlein and W. Gregory, Handbook on the Law of Agency and Partnership 250-51 (1979).
It is generally accepted that the existence of a partnership depends on the intent of the purported parties. The parties must have in some form expressed an intention to form a partnership. A. Bromberg and L. Ribstein, Bromberg and Ribstein on Partnership, § 2.05 at 2:36 (1988). An expressed agreement is not required; intent may be implied, or established from the surrounding circumstances. Norman Products v. Bozeman, 557 So.2d 1265, 1270 (Ala. 1990). Wilder v. Hobson, 101 N.C. App. 199, 398 S.E.2d 625 (1990). The manner in which the parties characterize the relationship is probative. The ultimate question is: did the parties intend to do the acts that in law constitute partnership? Beckman v. Farmer, 579 A.2d 618, 627 (D.C. 1990).
Participation in the control of the business is indicative of whether a partnership exists. Dority v. Driesel, 75 Or. App. 180, 706 P.2d 995, 998 (Or. Ct. App. 1985). Control is associated with the requirement of co-ownership. However, it is difficult to determine when one has the control sufficient to establish partnership. Control by itself is not the exclusive indicator of partnership. "Partner-like control" may or may not be found depending upon the surrounding circumstances, because the circumstances will vary from relationship to relationship. Bromberg and Ribstein, § 2.07(c) 2:60-2:65.
Profit sharing is specifically mentioned as prima facie evidence of partnership at section 79-12-13(4) of the Mississippi statute. That sub-section also provides circumstances in which payment is not prima-facie evidence of the existence of partnership. Because the Uniform Partnership Act requires that the relationship be one for profit, the sharing of profits is an essential element of partnership. The Uniform Partnership Law also expressly mentions the sharing of losses at § 79-12-35(1)(a). Thus, one of the main indicators of a partnership is the right of a party to share profits and losses. Scharf v. Crosby, 120 A.D.2d 971, 502 N.Y.S.2d 891, 892 (1986); Dority v. Driesel, 706 P.2d at 998; Bromberg and Ribstein, § 2.07(d), 2:67-2:71.

A. Intent
Intent of the parties to form a partnership must be established by the proof. In this case this Court does not have to look to circumstances to infer such an intent. The parties  Lea, Smith, and Redd  all agree that there was an express intent to form a partnership. Additionally, the surrounding circumstances bear out that express intent; Lea and Smith brought assets of L & S Logging into the IHP business, prepared the plant site without remuneration, and ran the sawmill business.
The issue here, then, is not whether the parties intended to become partners. The issue is whether the condition precedent occurred to seal that partnership contract. Those expressed conditions precedent to the partnership's formation were two: (1) the payment of the bank debt; and (2) the repayment to Redd of his initial investment.
By Redd's own proof one of the conditions had already been met and the other was not accomplished by his own choice or business decision. Redd's proof showed that IHP had generated enough monies to retire the bank debt at the latest date of December 31, 1986. Redd had made the decision as financial manager not to do so. (Vol. III, at 204). The failure of this condition to occur was Redd's business decision thereby depriving Smith of his reward.
As to the repayment to Redd of his capital contributions, the business records showed that Redd invested $410,452 and withdrew from the business $500,475. The *995 two criteria had been met by December 31, 1986. It was not necessary, although desirable, that a corporation be formed.

B. Control
The undisputed arrangement for operating IHP was for Redd to handle the financial matters, being his expertise, and for Lea and Smith to direct the sawmill operations, being their expertise. All parties made business decisions; all parties hired and fired employees and supervised them. All three entered into management decisions, such as building an office building and constructing a mill to build pallets. The facts shown support the conclusion that control over the business was exercised by Smith, not just as a manager or supervisor, but as one with ownership interest.

C. Profit Sharing
Admittedly, there was no profit-sharing evidenced by the testimony except as to splitting cash on occasions. But that division evidences the position of Smith. Additionally, Lea received $20,000 from Redd at his departure from the business evidencing more than an ordinary employer-employee relationship.
Lea and Smith were paid as employees with withholdings of income tax and social security tax. Benefits from workers' compensation were claimed by Smith. On the other hand, Smith and Lea worked approximately sixty-five (65) hours a week in 1981 without overtime pay.
Recognizing that Smith was working toward the retirement of debts of IHP to Redd and the bank so that the partnership could come to fruition, the receipt of wages during this preliminary period does not per se defeat the existence of a partnership. Smith was working long hours for little remuneration to establish the business and to pay off the debts. It was for this reason that the chancellor awarded Smith the amount of $50,000 to be equitable for his labor.

D. Chancellor's Finding
The chancellor found that Smith and Lea were employees drawing a regular salary and that there was an agreement to enter into a partnership as soon as the bank and Redd were repaid. Since the bank, not Redd, had not been paid, the chancellor found there was no partnership and Smith was owed nothing. These findings overlook important testimony. Redd admitted to Smith in a tape-recorded statement that a partnership existed:
SMITH: O.K. Gordon, I want to ask you, do you remember what all you told me when ever we went to logging?
... .
REDD: I called ya'll to come up here and we went right in there and sit down, and I asked ya'll if you want to do it? Said yes. Alright, I said when we get the debt paid down, when we get me paid, that's the words I said, I said you get a percentage in it, you can get a third, a half, a quarter or all of whatever you want. Ya'll spoke up and said no we want you to have controlling interest. I said well whatever, we'll do it.
SMITH: Right, right.
REDD: That's the words I said.
SMITH: Well, I don't remember about when we get the debt paid and paying you, I mean that part.
REDD: I said that at least a dozen times.
SMITH: Well, I'm being honest now with what I said, I don't remember you saying that part. O.K. Me and you set over there in the office before Christmas and talked about it and what all you told me, I mean how come you never did do nothing about it.
REDD: Because I got tied up on some more business and I just hadn't had a chance. I've had my nose to the grind stone.
... .
SMITH: Well, I mean what I'm talking about its been going on 6 years, I mean. Alright, now, after Jackie got out of it, what did you feel like Gordon, I mean when Jackie got out of it, being honest between me and you?
... .

*996 SMITH: Well, do you remember telling me that when Jackie got out of it that it would mean more to me and you?
REDD: That's right, that's exactly right.
SMITH: That maybe, the way it sounded to me that I would have a little bit more in it and you would have a little bit more in it.
... .
REDD: ... . that's what I said, it just mean more to you.
SMITH: Well as of last week, if you were going to draw it up and everything what percentage would you base your figures on over there?
REDD: I'd base the figures on about a third for you and two-thirds for me.
SMITH: On it?
REDD: That's what I base it on.
SMITH: In other words if Jackie had stayed on, it a been a third for him, say and a third, you know, for me, and then, you know, a third for you?
REDD: No, if Jackie had stayed in, it been about 20/20 and 60. Cause the words ya'll said, no, I said, I said a quarter, a third, a half or all of whatever and that, you know, that even... .
SMITH: a third, or a quarter or half or whatever we wanted?
REDD: ... . that's right. And then ya'll both spoke up and said naugh we wanted you to have control of the thing, naugh and that's the same words that you told me over there when we sit... .
... .
SMITH: In other words, what you saying you figure my percentage is a, is a third... .
REDD: Yes, sir.
SMITH: a third? In other words, whatever the sawmill is worth and whatever its all valued at and the cash and what on the books adds up I should get a third?
REDD: And whatever, and less whatevers owed.
SMITH: Ya, and what's ever less is owed, I should get a third of it?
REDD: In other words, the net that's what I feel like.
Additionally, the chancellor overlooked the fact that the conditions precedent to the acquiring of a partnership interest had occurred according to the testimony. Redd had recovered his capital investment; the bank debt could be satisfied from IHP assets, but Redd had elected to forego satisfaction of the indebtedness as the financial manager. His decision prevented Smith from acquiring his rightful interest. Although he found that no partnership existed, the chancellor nevertheless acknowledged that Smith was due some payment and ordered the payment of $50,000. This finding is consistent with the existence of more than an employer-employee relationship. In sum, the partnership should have come into existence according to Redd and Smith's agreement no later than December 31, 1986. This Court reverses the chancellor on these two findings and renders judgment on the issue of whether a partnership existed between Smith and Redd as of December 31, 1986. That is, this Court holds that a partnership did indeed exist.

III.
The chancellor found no partnership; therefore, he addressed no division of interest. The parties never finalized an agreement as to a specific division of ownership in the business. The tape recorded conversation between Smith and Redd evidences the parties' agreement that Redd was to have controlling interest. Redd indicated that he thought the division would be one-third to Smith. However, without the chancellor's factfinding as to the parties' intent regarding division, this Court cannot decide this issue.
Therefore, the cause is remanded for a determination by the chancellor of the partnership interests of Redd and Smith. The chancellor's determination shall not be inconsistent with this opinion, i.e., not less than one-third nor more than forty-nine percent. Upon that determination, the chancery court will be in a position to determine the value of Smith's interest as of December 31, 1986, for dissolution of the partnership.
*997 This reversal will of necessity eliminate the various equitable awards to Smith by the chancellor in favor of his partnership status.
AFFIRMED AS TO DENIAL OF PUNITIVE DAMAGES; REVERSED AND JUDGMENT RENDERED AS TO THE EXISTENCE OF THE DECEMBER 31, 1986, PARTNERSHIP BETWEEN SMITH AND REDD; REMANDED FOR DETERMINATION OF DIVISION OF PARTNERSHIP INTERESTS.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, PITTMAN, BANKS and McRAE, JJ., concur.
SULLIVAN, J., dissents without written opinion.