872 So.2d 23 (2003)
Donald EVANS, Appellant,
v.
Odis L. CLEMONS, Appellee.
No. 2001-CA-01819-COA.
Court of Appeals of Mississippi.
September 9, 2003.
Rehearing Denied January 13, 2004.
Certiorari Denied May 6, 2004.
*25 Harry R. Allen, David W. Crane, Gulfport, attorneys for appellant.
Mack A. Bethea, Gulfport, attorney for appellee.
Before SOUTHWICK, P.J., BRIDGES and CHANDLER, JJ.
SOUTHWICK, P.J., for the Court.
¶ 1. The owner of a building appeals the damages awarded against him for breach of his obligations under a lease. We find error in an instruction regarding damages. More fundamentally, we conclude that the plaintiff's own proof of damages was confusing *26 and conflicting, with the defendant's responsibility for the shortcomings of the evidence not being resolved by the judge. We leave open a hearsay issue but invite the trial court to make more detailed findings if the evidence again is offered. We reverse and remand as to liability and damages.
¶ 2. On April 1, 1997, Donald Evans leased a building in the city of Gulfport to Odis Clemons for use as a nightclub. The lease called for different amounts of rent for each year of its three-year term. No rent was to be paid for the first eight months. It was anticipated that substantial repairs and purchases of equipment would be needed. In exchange for the abatement, the lessor Evans would own all equipment placed in the club. Clemons and two partners, Marvin Brundidge and Greg Dampeer, operated the property, called Club Unique, without apparent difficulty until some time in the late summer of 1998.
¶ 3. What happened to cause the rupture among the parties is contested. Clemons contends Evans insisted upon becoming a partner in the venture; Clemons refused, causing Evans to threaten him with a gun. Brundidge claims Evans told him not to return to the premises. Evans claimed Clemons approached him on several occasions about becoming a partner to which he finally assented in the summer of 1998, but then Clemons stopped paying rent. Whether Clemons continued to pay rent after July 1998 was a matter of dispute. After January 1999, when Clemons failed to return to the club, Evans claims Clemons abandoned the lease.
¶ 4. Clemons, Brundidge and Dampeer filed suit against Evans on April 2, 1999. They claimed that they had been forced out of possession of the premises, and that the covenant of quiet enjoyment had also been breached. A jury found against the defendant and awarded $250,000 in actual damages and $100,000 in punitive damages.

DISCUSSION

1. Partnership vs. personal claims
¶ 5. Although all three partners brought suit against Evans, two of themBrundidge and Dampeermoved to be dismissed on the eve of trial. Evans did not object. The motion was granted on the basis that only Clemons was in privity of contract with Evans.
¶ 6. Evans now argues that because all partners were not parties to the suit, any damages the partnership itself suffered may not be recovered. Instead, Clemons may recover only for losses, if any, that he had independent of those sustained by the business. There was no partnership document, but no party seriously disputes that Clemons, Brundidge and Dampeer were partners in the operation of Club Unique. Intent, control, and profit sharing form the basis for a partnership even if oral expressions alone provide those terms. Smith v. Redd, 593 So.2d 989, 993 (Miss.1991). We find overwhelming evidence that these three men intended to join in the business together, that each had a role in the club, and all were to share in the profits. There was a partnership.
¶ 7. Generally, if the subject matter of the litigation is partnership property, all partners must be joined. Scott v. Enco, 264 So.2d 409, 411 (Miss.1972). A partnership cause of action belongs to the partnership, not to individual members. Cates v. International Tel. and Tel. Corp., 756 F.2d 1161, 1176 (5th Cir.1985). All began the suit, but only one was left when trial began.
¶ 8. The claims made in this suit explicitly concerned the Club Unique enterprise *27 operated by the three partners. When two of the partners asked to be dismissed, their counsel made no initial explanation of the reason for the dismissal. The trial court stated "I think that's proper given that [Clemons is] the only one that has privity of the lease." Counsel then responded "That's the reason I was doing that, Your Honor." The Court then stated that having Clemons as the sole plaintiff "simplifies and narrows the issues." What that meant is unclear.
¶ 9. The defendant Evans argues that the simplification was to leave the relevant damages solely being those suffered by Clemons as an individual as distinguished from any that he suffered as a partner in Club Unique. For example, since Clemons was Evans' lessee, if the failure of Club Unique had prevented payments to Clemons for the club's sublease of the property, those might have been recoverable damages. No sublease was apparently entered; the lease barred subleases without Evans' approval. In fact, all of Clemons' meaningful potential losses arose from his membership in a partnership. The defendant Evans agrees, and therefore states that the entire array of damage testimony was irrelevant since it did not indicate how Clemons as an individual was injured.
¶ 10. However, even after two partners were dismissed, there was no amendment of the pleadings to remove the claims for losses by Club Unique. The suit continued as one regarding the club, operated as a partnership, yet with only one partner remaining as a party. Perhaps all damages were recoverable if the voluntary departure of the other partners in a suit over partnership damages relinquished their claims to the remaining plaintiff or at least allowed those claims to be resolved in their absence. Rulings by the trial judge, and arguments along the way by plaintiff's counsel, made it plain that it was only the defendant Evans who believed that claims of losses by Club Unique had been removed from the case by the departure of Brundidge and Dampeer.
¶ 11. The partnership had the claim. The partnership consisted of three men; two of them voluntarily departed with partnership claims pending. We conclude that the primary issue is whether the absent partners were indispensable parties for the claims over partnership damages. M.R.C.P. 19. The purpose of Rule 19 is to protect the interests of the absent parties so as to ensure a disposition that is fair and one that is complete. Shaw v. Shaw, 603 So.2d 287, 294 (Miss.1992). We examine the missing individuals' interests to determine whether the parties are indispensable; prejudice to the defendant is irrelevant since he failed to object to dismissal of those parties. Id. To the extent the defendant is arguing that no objection was needed since the necessary effect of the dismissal was to alter the case to one just of damages to Clemons' leasehold interest, we do not find that to be an accurate view of the factual basis for this dismissal.
¶ 12. When Brundidge and Dampeer sought dismissal from the suit, their counsel stated that it was because Clemons was the only signatory to the lease with Evans. The law of agency applies to partnerships, though. Miss.Code Ann. § 79-12-7(3) (Rev.2001). Each partner acts as an agent of the partnership and his acts bind the partnership if the action falls within the scope of the partnership business. Miss. Code Ann. § 79-12-17(1) (Rev.2001). Clemons could enter a valid lease for the other partners. Claims regarding the breach of the lease would have been the claim of all. Issues regarding potential breach by Clemons would have raised whether his agent-partners had committed *28 breaches for which he was responsible. Dismissal of Brundidge and Dampeer did not simplify the issues but only created a new one.
¶ 13. Since the dismissal of two partners was at their own request, with no indication then or later during the course of trial that the club's losses were no longer being litigated, we find that the former plaintiffs' acquiescence removes the need for all partners to be present. If those individuals wish to make a claim to any award made, that would have been for them to pursue against Clemons. To the extent the dismissed individuals might have liability for a breach by the partnership, the defendant's failure to object makes the dismissal beyond complaint. In addition, since no relief against the partnership was awarded anyway, on this verdict the issue is moot.
¶ 14. We are reversing and remanding for other reasons. The issues that normally arise under Rule 19 may be readdressed below. Acquiescence and waiver do not prevent Brundidge and Dampeer from rejoining the case for the new proceedings that we are ordering. Preservation of judicial resources suggests that they reappear unless the dismissed parties enter a relinquishment of all claims arising from a possible breach of this lease.

2. Renovation expenses
¶ 15. Evans next argues that testimony should not have been admitted regarding expenses for renovating and refurbishing the building before the club opened for business. The lease provided that no rent would be paid for the first eight months. In exchange, the furnishings and equipment that would be needed to make the facility functional would become the property of Donald Evans. Clemons sought recovery of some $153,841.60 for these expenses.
¶ 16. The trial court agreed that the plaintiff Clemons was not entitled to direct reimbursement of the costs of the equipment if the jury found that Evans had breached the lease. However, the lessee was supposed to have use of that equipment for the entire life of the lease. If Evans caused a premature ending of the lease, then something of value was taken because the opportunity to use that equipment ended too soon. An instruction was given that the jury could "consider as one element of `lost profits' the usage value of that equipment which Mr. Clemons added from the date of the breach until the date of the lease term." The defendant Evans objected to the instruction.
¶ 17. We agree that Clemons was to have the opportunity to use the equipment for the entire life of the lease. A breach that caused the lease to end in less than three years took away part of the opportunity. Yet we agree with the defendant that to inform the jury that they should consider a usage value as an additional measure of lost profits was confusing and encouraged a double recovery. The right to use the equipment was for one purpose, namely, to permit a profit to be made on the business. This case was an effort by Clemons and, for a time, his partners to recover for their alleged lost opportunity to continue to operate the club and earn profits. Besides seeking to prove the amount of income from sales of food and beer and from a cover charge for each patron, the plaintiffs would need to show the costs of operating the business. There were expenses in purchasing, operating and maintaining the equipment. Those reduced the profit. We find no manner in which the equipment itself could be assigned a usage value as an independent profit center for the business. If there was a means, Clemons offered no proof on how to do so. Instead, there was evidence *29 of the more than $150,000 cost of the equipment, a totally irrelevant figure if it or some fraction is used to increase the profits otherwise computed.
¶ 18. There was no relevance shown for the equipments' usage value. The instruction to include such a value in the computation of lost profits we find to be prejudicial error. Even if actual damages for premature loss of use might be measurable independently of lost profits, this would not justify a properly challenged, faulty explanation of how to determine such damages.

3. Proof of damages
¶ 19. More broadly than as to the just-discussed issue of the equipment, the defendant Evans argues that proof of damages was too speculative to allow accurate calculation by the jury.
¶ 20. All parties agree that the proof of damages left much to be desired. Evans argues that it left much to the imagination. Clemons, Brundidge and employees of the club testified as to the income and expenses of the club. Clemons introduced a summary report entitled "Original Investment-Expenses" which listed a number of items purchased and services rendered in preparing the club for opening. Four documents were introduced through Brundidge entitled "Club Unique Income-Expense" for the months of February through May 1998. These included the gross income for each of the months and listed various expenses such as rent and utility payments, payroll and stock expenses. Both Clemons and Brundidge testified all other records were lost to them when Evans forced them from the property.
¶ 21. The burden of proving damages rests upon the plaintiff. Adams v. U.S. Homecrafters, Inc., 744 So.2d 736, 740 (Miss.1999). Damages must be established with sufficient certainty as to remove them from the realm of mere speculation or conjecture. Id. A party will not be barred from recovering because he cannot provide a perfect measure of his damages. Id. To a great degree, most damage assessments unavoidably contain a measure of conjecture. The question then is whether the judgment is based upon excessive speculation.
¶ 22. The difficulty with the damages evidence produced in this case is the widely varying accounts of both expenses and income. The conflicting evidence was not only between plaintiff and defendant, as is to be expected, but between the plaintiff and his own witnesses, including his partner, the club's designated bookkeeper. Clemons and Brundidge both testified that the club spent between $XXXX-XXXX per week on beer and other bar supplies, though Clemons was simply asked to confirm that figure based on Brundidge's earlier testimony. Brundidge stated twice on cross-examination that they purchased between $5,000 and $7,000 of beer per week. The documentation kept by Brundidge shows those figures to be monthly expenditures, not weekly. In testifying from the documents, Brundidge stated that specific amounts in the $5,000 to $7,000 range were monthly amounts and were spent on "bar stick, beer, Cokes, wine coolers, etc." He did not correct his earlier testimony, but neither was he asked to do so. Thus the jury was given widely different figures, with the testimony that these were weekly figures as dominant as the testimony that they were monthly.
¶ 23. Witness Michael Smith, who held a managerial position from the time of its opening, testified the club employed approximately eight people who were paid $200 per week. His own salary ranged between $350-400 per week. At a minimum, *30 then, the monthly payroll expenditures would be $7800. The income and expense report notes only $1690-2075 in monthly payroll expenses. Smith also stated that most of the waiter and waitress income was from tips, but he did not retract his statement that each staff member received a weekly salary of about $200. After stating that he made between $350 and $450 per week, this is how he described the other salaries:
Answer: The average payroll was usually about 200 bucks.
Question: 200 bucks total?
Answer: No, not the total payroll, per person.
Question: Per person. So you had eight people at 200 bucks, $1,600, plus yours, 350 to 450?
Answer: Yes.
¶ 24. It is difficult to perceive how else the jury could have received this testimony other than the payroll was close to $2,000 per week. The "payroll" in normal parlance means something paid by the employer. Tips paid by customers would have been in addition. The only evidence of a specific dollar amount paid to staff was what has been set out here. Any sense that these numbers should be recast into a combination of wages and tips finds no support in the record.
¶ 25. Clemons testified that he was still burdened with paying various utilities bills which continued to accumulate after his ouster from the club. Although asked, he did not explain why he did not simply have the utilities disconnected. The law imposes upon an individual the duty to mitigate his damages. Frierson v. Delta Outdoor, Inc., 794 So.2d 220, 225 (Miss.2001).
¶ 26. Clemons claimed as damages the cost of an air conditioning unit financed by his employer, Mississippi Power Company. He testified that he continues to have payments for the unit deducted from his paycheck. Frank Castiglia, however, from Mississippi Power testified that Donald Evans had paid the debt in full. Evidence of the paychecks was not introduced.
¶ 27. Both Clemons and Brundidge testified that income above the immediate expenses was used to pay some of the investors but this is not reflected on income and expense reports, skewing what would be considered profit.
¶ 28. There is a lack of documentary support for the damage claims. Clemons offered only four income and expense reports which according to his own testimony are incomplete for failing to account for the debt service expenditures. Clemons explains this failure by stating that the club records were kept in the club office which was made inaccessible to him after Evans prevented him from returning to the premises. That might justify shortcomings in the evidence, but we have no finding by the trial judge that in fact Evans did create the difficulties in proof. Instead, we have the plaintiff's unsubstantiated allegations. At the time of a motion for directed verdict, the defendant argued the inadequacies of the evidence including that on damages. Those defects are profound. If they are to be excused, it is because the trial judge finds that this is the best evidence available and the failure to produce better proof is in large part the fault of the defendant.
¶ 29. Brundidge testified that the club's finances were deposited and withdrawn from his personal checking account. He did not provide any statements and said that he did not have them. Evans would not likely have been able to prevent those records from being available. Other records which would not likely have been confiscated by Evans also were not offered, such as the Mississippi Power paychecks *31 that allegedly would show deductions for an air conditioning unit.
¶ 30. It is "absolutely incumbent upon the party seeking to prove damages to offer into evidence the best evidence available [for] each and every item of damage. If he has records available, they must be produced. While certainty is not required, a party must produce the best that is available to him." Puckett Mach. Co. v. Edwards, 641 So.2d 29, 37 (Miss.1994) (quoting Eastland v. Gregory, 530 So.2d 172, 174 (Miss.1988)).
¶ 31. Clemons is not relieved of the obligation of providing proof when it is available. The issue of Evans' possible interference with the providing of adequate documentation remained a matter of unresolved fact. The plaintiff's own evidence was conflicting and confusing. The award cannot stand. We remand so that at a new trial a fact-finding may be made of whether the inadequacies of the record may properly be laid at Evans' feet. If so, the otherwise inadequate evidenceat least if the evidence is similar to that offered in the first trialmight be justified.

4. Statutory violation
¶ 32. Evans asserts that Clemons is prohibited from claiming lost profits resulting from the club's sale of beer. Clemons did not have a license to sell beer, as the club was using a license issued to Lorraine Howze, who was neither a party to the lease nor a partner in the club enterprise.
¶ 33. The liquor license statutes require the application for a license to contain a statement showing the name of the business, and if a partnership, firm or association, the name of each partner or member. Miss.Code Ann. § 67-3-17 (Rev.2001). In order to qualify as a license applicant, the applicant must be either the owner of the premises for which a permit is sought or the leaseholder. Miss.Code Ann. § 67-3-19(d) (Rev.2001). A license also may not be transferred. Miss.Code Ann. § 67-3-23 (Rev.2001).
¶ 34. Evans testified that he executed a second lease to the property to Lorraine Howze after being informed by Clemons that he was having difficulty qualifying for a license. The propriety of this apparent attempt to circumvent the liquor statutes is not before this Court. It is undisputed that the contract at issue lists Clemons and Evans alone. There was some testimony that Howze was a partner in the club. Even if Howze was a partner, she failed to comply with the requirement to list every other partner in the business and it is undisputed that there were at least three such partners. The club was thus selling beer in violation of the licensing statutes.
¶ 35. This, however, does not preclude recovery. There was a time when a contract entered by a business that failed to obtain the proper privilege license was "null and void so far only as such person shall base any claim upon them, and no suit shall be maintainable in favor of such person on any such contract." Phenix Ins. Co. v. Pollard, 63 Miss. 641, 642 (1886) (quoting Miss.Code § 589 (1880)). That particular license statute was amended not long after the Phenix suit to remove any reference to void contracts and instead to provide for criminal penalties for the business that was not properly licensed. Miss. Code Ann. § 3894 (1906). That is also the present approach. Miss.Code Ann. § 27-15-215 (Rev.1999). We are not dealing with the general privilege license but instead the specific beer and light wine license. Still, it is instructive that the failures of businesses to conform with general *32 licensing requirements do not close the courthouse door to their contract disputes.
¶ 36. The business must still be a lawful one and the violation of law must not have caused the claimed injury. Meador v. Hotel Grover, 193 Miss. 392, 9 So.2d 782, 785 (1942). Recovery is allowed under lawful contracts that are supported by lawful consideration. Martin v. Estate of Martin, 599 So.2d 966, 969 (Miss.1992). The lease here was a valid contract. The sale of beer is permitted but only when certain conditions are met. Those conditions may not have existed, but any failure was not a contributing cause of the damages that plaintiff seeks.
¶ 37. We should not be read as ignoring illegal conduct. The question is one of remedy. The cited precedents provide that failure to have a regulatory license may not be used as a basis in a suit between private individuals to alter the normal measure of damages for breach of contract. The State has provided penalties including fines and imprisonment for the sale of beer without the proper license. Miss.Code Ann. § 67-3-15 (Rev.2001). Prosecutorial discretion, lack of awareness of the violation, and other matters may often prevent that remedy from being utilized even when it would be applicable. Even so, the rights of the parties are to be sorted out regardless of the licensing issue; the responsibility of the seller to the State may only be determined in other proceedings.

5. Hearsay
¶ 38. Evans argues the trial court erred in allowing hearsay testimony of Kevin McInnis. McInnis was present in the club in September 1998. He testified that he heard Clemons and Evans arguing in the back room without knowing the substance of the argument. Clemons then exited the back room, looking nervous and upset. McInnis and Clemons left the club, got into a car together and drove away. While in the car, Clemons told McInnis that Evans had threatened Clemons with a gun. Evans objected to this testimony at trial. Clemons argues that this admittedly hearsay statement was admissible as either an excited utterance or a present sense impression.
¶ 39. An excited utterance is defined as a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. M.R.E. 803(2). The rationale for this exception is that one caught in a sudden, startling event lacks the capacity for calm reflection, tending to make such statements reliable. Smith v. State, 733 So.2d 793, 799 (Miss.1999). A present sense impression is a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter. M.R.E. 803(1). It too is based on the absence of opportunity for deliberation.
¶ 40. Evans objected to the evidence because of the absence of proof of the length of time between the event and Clemons' report of it to McInnis. McInnis did not offer any estimate of the length of time between these two events or whether Clemons still appeared upset and under the influence of the stressful event. The trial court did not state which of the two proffered exceptions applied, but merely allowed the testimony.
¶ 41. We first address whether the statement qualified as a present sense impression. As mentioned, such a statement must describe or explain an event, and must be "made while the declarant was perceiving the event or condition or immediately thereafter." M.R.E. 803(1). The comment to the Rule states that the *33 statement must be "spontaneous," because it must be "unlikely that the declarant made a deliberate or conscious misrepresentation." M.R.E. 803(1) cmt. Conceptually, the event must be speaking through the declarant instead of the declarant's reflectively speaking about the event. It is evident, to use perhaps some understatement, that ill will existed between Clemons and Evans on the night of the alleged incident. It is critical that neither side be able to make its proof regarding what happened simply because that person was foresighted enough to make an early conscious characterization of the event. Rigorous application of the hearsay rules is one of the few protections against that possibility.
¶ 42. The witness McInnis who heard the hearsay statement did not plainly establish the length of time between the event and the statement. Clemons may have made a somewhat clearer statement about the time frame than did McInnis, but surely the person whose possible deliberate fabrication is the concern that is being weighed cannot also provide the evidence to prove spontaneity. Instead, we look to what McInnis stated. The dissent quotes the testimony and we will only restate the key sections. McInnis stated that Clemons came out of the room in which he and Evans had been speaking loudly at each other. When Clemons came out of the back room, he was "pretty upset and nervous." "We left shortly, well, right after that we left." The pair left the building, got into the vehicle, and drove off. The testimony could be interpreted to mean that soon after they got into the car, Clemons made the statement about Evans having a gun. McInnis stated that "we got into the car, and he just said that Donald [Evans] had a gun." Clemons did not say anything else about what occurred or speak further about the gun.
¶ 43. The defense objected to the testimony twice. Once, before the statement about the gun was related, the trial court agreed that a better foundation was needed. Then after that additional testimony, the defense asserted that a proper foundation for the hearsay still had not been laid. The plaintiff had already argued these two hearsay exceptions as the basis for admission. The trial judge after the first defense objection required that a better predicate be laid "with respect to the time frame and the condition of Mr. Clemons." In context, "condition" would have to mean whether he was excited when he made the statement. The defense attorney then argued after what ostensibly was a better predicate was offered, that still he did not "think the foundation's been laid." The counsel argued that the witness did not know whether an argument had taken place. Instead, all he had heard was voices. Perhaps defense counsel could have been clearer, but what had just occurred was that the other attorney had offered additional testimony in response to the judge's direction to show better what the declarant's "condition" was and the time frame. We interpret the final objection as being that what the witness had heard, perhaps loud voices, did not prove the declarant's condition as excited. Counsel did not again allude to the time frame, but the length of time after an exciting event is part of the evidence needed to show whether the declarant is still operating under that stress. The court overruled the objection, and the hearsay about the gun was admitted. Counsel did not need to restate all of his initial objection. By renewing it after the foundation allegedly was made, the issue was preserved.
¶ 44. We find the foundation for the spontaneity of the statement under the present sense impression exception to be *34 weak. In order for this exception to be applied, the trial court had to decide whether too much time had passed for the event to be speaking spontaneously through Clemons as opposed to Clemons' non-spontaneously and deliberately speaking about the event. If the evidence fails to establish the temporal relationship, the statement will not qualify as a present sense impression. Smith, 733 So.2d at 799. Since the trial court never stated which exception he was using, the court may well not have found it to be a spontaneous present sense impression.
¶ 45. Time is also a factor in determining whether this statement was admissible under the separate excited utterance exception. Time, though, is simply a component of the central consideration that the declarant must still be so affected by the startling event as to justify the statement as being spontaneous and not the result of reflection. Devance v. State, 768 So.2d 319, 323 (Miss.Ct.App.2000). McInnis testified that Clemons appeared nervous and upset upon exiting the club's back room. That is at least some evidence of the necessary excitement, though the trial judge also did not identify this as the applicable exception. The court did not state whether the testimony proved the extreme emotional state that the exception contemplates.
¶ 46. Since we are reversing for other reasons, we leave open the issue of this hearsay. We should not be interpreted to be holding that the statement is or is not admissible hearsay. If this hearsay is again offered at a trial, a predicate will again need to be laid. Fact-findings regarding the applicable exception should then be made when the evidence is either admitted or excluded.
¶ 47. We point out that Clemons also testified that Evans had a gun. Evans denied that he ever pulled a gun on Clemons. Corroboration of one of the two stories gave a basis for the jury to determine who was telling the truth. The corroboration was solely by allowing Clemons' own words on the day of the alleged incident to be used to corroborate himself. Therefore the trustworthiness of those words was central to their use and to the permissibility of their affecting the fact-finding by the jury. What all hearsay exceptions are based upon is that something about the nature of the hearsay makes it trustworthy and too unlikely to be a self-serving fabrication.
¶ 48. We find that the question of Clemons being forced off the premises with a gun to be important evidence regarding whether Evans breached the lease or whether for other reasons the partnership decided to stop operating.
¶ 49. We reverse the finding of the jury as to liability and remand for further proceedings.

6. Excluded witness
¶ 50. Evans argues he was prejudiced by the trial court's refusal to allow a Gulfport Police Department representative to testify. The witness had not appeared before the defense rested its case. We find that this matter need not be resolved, as reopening the defendant's case for this witness and the issue of the proper timing for calling the witness are unlikely to recur after remand. We note that this testimony also was relevant to the question of whether a gun was used by Evans to force Clemons off of the Club Unique property.

7. Jury Instructions
¶ 51. Evans assigns as error the grant of two jury instruction over his objections.
Instruction P-2:

*35 You are instructed that, should you find for the Plaintiff in this case, you must confine your verdict to reasonable compensation for the injuries actually sustained, if any, by the Plaintiff as a result of the Defendant's wrongful termination of the lease entered into with the Plaintiff, Odis L. Clemons. Plaintiff's reasonable compensation, if any, does not include attorney's fees, nor does it allow a monetary award which constitutes a penalty against the Defendant, nor are you limited by the estimates of damages made by the attorneys representing the parties to this lawsuit.
Instruction P-3:
If you find from a preponderance of the evidence in this case that the Plaintiff has sustained actual damages as a proximate result of the Defendant's wrongful termination of the lease entered into with the Plaintiff, Odis L. Clemons, then the Plaintiff is entitled to a verdict in an amount which will reasonably compensate the Plaintiff for his loss sustained. Such damages are called compensatory or actual damages and are awarded for the purpose of making the Plaintiff whole again insofar as a money verdict can accomplish that purpose.
¶ 52. Evans argues these instructions assumed his liability, took away the jury's ability to determine if the lease termination was wrongful, and constituted improper peremptory instructions. Each begins with the caveat that the instruction applies only if the jury has found for the plaintiff. Later in each of the instructions, that limitation is not repeated.
¶ 53. The writing of jury instructions is an art, one perhaps too little understood by those trained in the law such as the trial counsel and judges at every level. What confuses jurors and what explains are matters that often get lost in the minutiae of esoteric legal argument. We find that from a legal point of view the instructions were acceptable and we would not reverse based on the language. That they may nonetheless have misled is possible. However, adding more words may as easily confuse as clarify. We leave the question of the repetition of phrases of limitation and exception for the parties to reargue if it arises again at a new trial.

8. Sufficiency and weight of evidence
¶ 54. Evans sought to have a judgment notwithstanding the verdict entered or else a new trial ordered. Juries decide contested issues of fact. Judges decide when there are no facts to support some part of a claim. We have discussed the matters of damages, and have found the evidence confusing, the instructions partly in error, and a new trial needed. The only remaining question, then, is whether the evidence was so lacking that we should enter judgment for the defendant. To determine if a claim is missing some element of needed proof, we examine the evidence supporting the claim along with all reasonable inferences favorable to it. Goodwin v. Derryberry Co., 553 So.2d 40, 42 (Miss.1989). We find sufficient evidence for jury deliberations about whether Evans interfered with Clemons' right to occupy the premises he leased and whether damages resulted.
¶ 55. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS REVERSED AND REMANDED. COSTS ARE ASSESSED TO THE APPELLEE.
McMILLIN, C.J., MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., BRIDGES AND LEE, JJ. THOMAS, J., NOT PARTICIPATING.
*36 IRVING, J., DISSENTING.
¶ 56. The majority finds that the question of whether Evans forced Clemons off the premises at gun point is pivotal to a determination of whether Evans breached the lease agreement. The majority then says it leaves open the question of whether the evidence on this point was erroneously admitted. However, the effect of the majority's holding is to find that the hearsay evidence was erroneously admitted. The majority then determines that the case should be reversed because it finds an instruction on damages was erroneous and Clemons's damage evidence too confusing and conflicting. With respect for the majority, I disagree on both points. Consequently, I respectfully dissent.
¶ 57. On the point of being forced off the leased premises at gun point, Clemons testified as follows:
Q. Did there come a time that you and Donald Evans had a falling-out?
A. Yes, sir.
Q. When was that?
A. Again, around July, September, he began coming around the building putting his hand in the cash register.
Q. Putting his hand in the cash register?
A. And taking money. Yes, sir.
Q. Y'all discussed a partnership at that time?
A. Yes, sir.
Q. And what was that conversation?
A. The conversation wasexcuse me, sir. He come in there, and I said, we don't want partnership, we doing good without a partnership.
THE COURT: You don't want a partnership?
A. Yes, sir. Then he said, goddamn fool
MR. CRANE: Object to hearsay.
THE COURT: Overruled.
A. He said, goddamn fool, you sign a contract with Mississippi Power Company and put all thempay all that money down, he said, I'll take the goddamn building and kill you. And draw a gun on me.
Q. When was that?
A. In September.
Q. In September?
A. Yes, sir.
Q. And he pulled a gun on you?
A. Yes, sir.
Q. Were you frightened?
A. Yes, sir.
Q. Did you come back to the club?
A. No, sir. After September 28th I did not come back.
¶ 58. The evidence, which was offered to corroborate Clemons's contention that Evans forced him, at gunpoint, off the leased premises, came essentially from the testimony of Kevin McInnis who testified as follows:
Q. Did you have occasion in September of '98 right before or right after Hurricane Georges to be in the club when Donald Evans came in?
A. Yes. I don't know if it wasI don't know if it wasI don't know if we wentI think we went in. I think me and Odis went in, and he was already there.
Q. He was already there?
A. Yes.
Q. Did you observe Odis talking to him?
A. Well, we went in. I was like at the bar, and they walked like towards the back in the little office room behind like the DJ booth. And I just heard them makingI heard some loud voices and changing words.

*37 Q. Angry words?
A. I just heard words. I don't know what kind of words was
Q. The voices were loud?
A. Yes.
Q. Did you eventually see Odis again?
A. Yes, sir. We left shortly, well, right after that we left.
Q. When you first saw him come out of the office, did you notice anything about him, his demeanor, the way he looked?
A. Well, he was pretty upset and nervous.
Q. And what did you observe as to his condition?
A. He was just nervous and upset. And we left out the building, got in the car.
Q. When you left the building and got in the car, did he tell you what had happened?
A. Yes.
* * * *
Q. What did he tell you?
A. Well, we got in the car, and he just said that Donald had a gun. And I didn't say anything else about it, didn't mention anything else.
* * * *
Q. Where did y'all go after that [after the conversation]?
A. I don't know if I went home, took, him home. I really, I just remember that we was [sic] together. We hung out for a little while longer.
¶ 59. The majority says it leaves open the question of whether McInnis's testimony should have been excluded under the excited utterance and present sense exceptions to the hearsay rule. But as I have already noted, the majority in reality finds that the testimony should have been excluded because, in the majority's view, the record fails to establish a temporal relationship between the period of time when Evans pulled the gun on Clemons and when Clemons told McInnis about it.
¶ 60. In my opinion, the record is sufficient to inform us as to the temporal relationship between the event and the subsequent utterance. I think the above-quoted colloquy makes it quite clear that the conversation occurred as soon as Otis and McInnis got in the car and left the premises. Also, the record is clear that Clemons and McInnis left the premises immediately after Clemons exited the room from which McInnis had heard the loud voices emanate. Therefore, I believe the trial court was correct in allowing McInnis's statement as an exception to the hearsay rule, whether as an excited utterance or a present sense impression.
¶ 61. I note that Evans did not make the specific objection in the trial court to McInnis's testimony which he now argues on appeal, that is, the lack of temporality between the event and the subsequent relating of the event to McInnis. An objection does not have to be stated with specificity if it is apparent from the context of the objection as to its grounds. Peterson v. State, 518 So.2d 632 (Miss.1987). However, where a party objects on a specific ground, the court on appeal does not need to consider whether any other ground was apparent from the context since it is clear that the appellant considered no other ground. Davis v. Singing River Electric Power Assn. 501 So.2d 1128 (Miss.1987). The record reflects that Evans's attorney objected several times to McInnis's testimony but never pinpointed the lack of temporality between the event and the subsequent relating of the event to McInnis as a basis for his objection. The objection was a general one, lack of foundation. *38 Certainly, what was meant by this statement is not apparent from the context. Therefore, I believe, he is procedurally barred. This is what the record reveals:
Q. When you first saw him [Clemons] come out of the office, did you notice anything about him, his demeanor, the way he looked?
A. Well, he was pretty upset and nervous.
MR. CRANE (Evans's attorney): Object to speculation, Your Honor. He doesn't know whether he was
THE COURT: He can testify as to his observations.
Q. When you left the building and got in the car, did he tell you what had happened?
A. Yes.
MR. CRANE: Object to hearsay testimony he trying to solicit, Your Honor.

MR. BETHEA (Clemons's attorney): Your Honor, I would characterize this as an exception being an excited utterance, present exception 801.2 and -3; 803.1, -2, and -3, Judge, exceptions to that.
MR. CRANE: Your Honor, there's no foundation for

THE COURT: Yes. Lay a little more foundation with respect to the time frame and the condition of Mr. Clemons.
¶ 62. After the above exchange, Clemons's attorney asked McInnis a series of questions before drawing a final objection by Evans's attorney in the following exchange:
Q. All right. When you got in the car, did he tell you anything.
A. Yes. He told me that they was in
MR. CRANE: Again, Your Honor, I'm going to object to the hearsay. I don't think the foundation's been laid. He doesn't know whether an argument took place or what took place. He just heard voices.

THE COURT: I'll allow it. I'll allow it.
(emphasis added).
¶ 63. I cannot understand the basis for the majority's statement that Evans objected to McInnis's testimony "because of the absence of proof of the length of time between the event and Clemons's report of it to McInnis." Majority opinion at (¶ 40). The relevant portions of the record, which are set forth above, show beyond doubt that Evans's attorney's reference to a lack of foundation being established referred to the fact that McInnis only heard loud voices and could not decipher what was being said by the two men in the back room. That is shown specifically by Evans's attorney's last explanation of his hearsay objection: "Again, Your Honor, I'm going to object to the hearsay. I don't think the foundation's been laid. He doesn't know whether an argument took place or what took place. He just heard voices."
¶ 64. It is true that the trial court requested Clemons's attorney to "lay a little more foundation with respect to the time frame and the condition of Mr. Clemons." However, Evans cannot complain on appeal of the lack of temporality between the occurrence of the event and the subsequent communication of the event to McInnis when Evans never objected in the trial court to McInnis's testimony on that basis. After the trial court became satisfied that Clemons had demonstrated a sufficient temporal nexus for admission of McInnis's testimony, nothing was left for the trial court to consider, given the general objection of Evans's attorney's objection. There is no requirement under either the present sense impression or excited utterance exceptions to the hearsay rule, as Evans's attorney argued, that the person who is told of the event must have witnessed *39 and understood the event as it was occurring. That requirement is on the declarant.
¶ 65. Since the last objection by Evans's counsel is clearly not an objection based on lack of temporality, the majority engages in a little creativity to conclude that the issue has been preserved for appeal. The majority says "perhaps counsel could have been a little clearer" and then proceeds to try and make clear that which counsel failed to do. In its attempt to do so, the majority says, "We interpret the final objection as being that what the witness had heard, perhaps loud voices, did not prove the declarant's condition as excited.... Counsel did not need to restate all of his initial objection." There are problems with this interpretation.
¶ 66. First, this interpretation fails to take into account that admission of hearsay under the present sense impression exception requires, as a prerequisite, two things: an occurrence of an event or condition, and a statement describing or explaining the event or condition while it was being perceived or immediately thereafter. M.R.E. 803(1). Admission of hearsay under the excited utterance exception also requires, as a prerequisite, two things: the occurrence of a startling event or condition, and a statement relating to the startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. M.R.E. 803(2). Second, counsel's initial objection was not specific. An objection based on lack of foundation could refer to either of the four prerequisites. Third it is beyond logic to suggest that one shouting in a loud voice at another for an extended period of time is not excited. Fourth, it was the trial court, not Evans's attorney, who tied the admission of McInnis's testimony to Clemons's counsel being able to "lay a little more foundation with respect to the time frame and the condition of Mr. Clemons." Nothing in the record indicated what Evans's attorney meant by "lack of proper foundation" until he told us during his last objection.
¶ 67. The majorityapparently conceding that Evans's attorney did not make the specific objection that McInnis's testimony should not be allowed because of the lack of temporality between the occurrence of the event and the relating of it to McInnisnevertheless, finds that Evans can use to his advantage the trial court's directive to Clemons's attorney to "[l]ay a little more foundation with respect to the time frame and the condition of Mr. Clemons." Assuming arguendo that the court's ruling provided the specificity that Evans failed to make, and that Evans could take advantage of it, it is only logical to conclude that when the trial court determined that the required specificity had been met, Evans no longer had an evidentiary bull in the fight because, all along, he had been riding the court's bull and not his.
¶ 68. Finally, the majority notes that "the defendant Evans argues that proof of damages was too speculative to allow accurate calculation by the jury." It is okay for Evans to make the argument, but, in my opinion, the majority errs in embracing it. In embracing the argument, the majority finds:
The difficulty with the damages evidence produced in this case is the widely varying accounts of both expenses and income. The conflicting evidence was not only between plaintiff and defendant, as is to be expected, but between the plaintiff and his own witnesses, including his partner, the club's designated bookkeeper.
Majority opinion at (¶ 22).
¶ 69. As an example of this "widely varying accounts of expenses and income" evidence, the majority finds that "Clemons *40 and Brundidge testified that the club spent between $5,000-$7,000 per week on beer and other bar supplies, while the documentation kept by Brundidge in the ordinary course of business shows those figures to be monthly expenditures, not weekly." It is true that Brundidge initially testified that the $5,000-$7,000 figure was a weekly figure. However, no one made the argument in the trial court that the problem with the evidence related to an inability to distinguish between weekly and monthly expenditures or that a conflict existed between the witness testimony and the documentation presented. Moreover, during further cross-examination of Brundidge, it was made clear to the jury, as shown by the following exchange, that the expenses were monthly and not weekly expenditures:
Q. On those sheets, I notice on each one of them you have a category for beer, etc. Would you read what that category is to the jury please. It's towards the bottom.
A. It says, bar stock, beer, cokes, wine coolers, etc.
Q. Okay. Now, how much in the month of February did you spend on those items?

A. $5,000.
Q. And that was all those items collectively, correct?
A. Yes.
Q. What about the month of March?
A. It was $5,800.
Q. Okay. And again, that was for all those items collectively?
A. That's correct.
Q. And then April?
A. $6,950.
Q. And then May?
A. $7,000.
Q. $7,000 even?
A. Yes. The first month was $5,575.
¶ 70. The majority also points to the testimony of Michael Smith, the manager of the club, in support of its finding that the accounts of the expenses, as well as the amount of income, varied widely. The majority quotes Smith as follows:
Witness Michael Smith, who held a managerial position from the time of its opening [the club's opening], testified the club employed approximately eight people who were paid $200 per week. His own salary ranged between $350-400 per week. At a minimum, then, the monthly payroll expenses would be $7,800 but the income and expense report notes only $1,690-2,075 in monthly payroll expenses.
Majority opinion at (¶ 23). Again, the majority quotes only part of Smith's testimony. During redirect examination, Smith testified as follows:
Q. These employees, what kind of work did they do at the club? Were they waitresses?
A. Waitresses.
Q. Did they get paid in tips or out of a salary?

A. A small salary but mostly the tips.

Q. Most of it tips?
A. Yeah.
When Smith's testimony is viewed in both context and totality, the so-called variance between his testimony and the record dissipates. It is reasonable to conclude from his testimony that, although the waitresses were paid $200 per week, the figure represented payment from both salary and tips and that the gross payroll figure did not include the tips. Moreover, here again, no one made the argument during the course of the trial, and certainly not during Smith's testimony, that there was a conflict between testimony and the documentation presented.
*41 ¶ 71. I do not find the problem with the evidence that the majority finds. I believe the evidence on damages was reasonably reliable and sufficient to allow the jury to arrive at a verdict based, not on speculation, but reasonably grounded in the evidence presented. It is clear from the evidence presented in this case that there was ample evidence from which the jury could make a reasonable determination that Evans, without legal justification, forced Clemons from the leased premises. There was also reliable evidence that essentially all of the financial records were left in the building when Clemons was forced out. I find no basis for faulting Clemons for not presenting additional financial records given Evans's actions. Moreover, as I read the record, Evans's chief complaint about the damage evidence was that the evidence should be limited to damages suffered by Clemons as opposed to damages suffered by the partnership.
¶ 72. I believe the majority, in arriving at the result it reaches today on the issue of the damages evidence, has substituted its finding for that of the trial judge and has overemphasized what it perceives as conflicting and speculative evidence. The trial court has broad discretion in ruling on the relevancy of evidence, and on appeal, the court's ruling will not be reversed unless there has been an abuse of discretion and the admission or exclusion affects a substantial right of a party. Terrain Enterprises, Inc. v. Mockbee, 654 So.2d 1122, 1131 (Miss.1995). The jury heard all of the evidence and, in my opinion, was properly instructed as to how it should consider that evidence. I find no abuse of discretion here.
¶ 73. The majority, however, takes issue with the following instruction:
Your are instructed that, should you find that the Defendant, Donald Evans, wrongfully terminated the lease which he entered into with the Plaintiff, Odis L. Clemons, then Mr. Clemons would be entitled to reasonable compensation for the injuries actually sustained, if any, as a result of this wrongful act. Such reasonable compensation is known as actual or compensatory compensation and does not include attorney's fees, nor does it allow a monetary award which would constitute a penalty against Mr. Evans.
Such actual or compensatory damages for breach of contract or lease must be proven by a preponderance of the evidence with reasonable certainty and may not be based merely on speculation and conjecture. In the event that you determine that Mr. Evans breached the lease and that Mr. Clemons has been injured by breach of the lease agreement, Mr. Clemons is entitled to be justly compensated and is to be made whole; however, it is never contemplated that he be placed in a better position than he otherwise would have been in if the contract had been performed.
In this case, if you determine by a preponderance of the evidence that Mr. Evans wrongfully terminated the lease and that Mr. Clemons is entitled to an award of actual or compensatory damages, those damages should be the net amount which Mr. Clemons lost as a result of not being allowed to maintain possession and control of the leased premises from the date of the breach to the end of the lease term, March 30, 2000. Based upon the language of the lease, the equipment and furnishing purchased by Mr. Clemons became the property of Mr. Evans prior to the date of the alleged breach. However, in calculating the award of actual or compensatory damages to Mr. Clemons, you may consider as one element of these `lost profits,' the usage value of that equipment which Mr. Clemons added to the premises from the *42 date of the breach to the end of the lease term.
During the instruction conference with the trial judge, Evans's attorney made the following remark about the portion of the instruction which the majority finds objectionable: "I'm not sure of the meaning of the last sentence, Your Honor." Thereafter the following exchange occurred:
THE COURT: Well, it is hard to articulate what I'm saying. It reads, "However in calculating the award or actual compensatory damages to Mr. Clemons, you may consider as one element of these lost profits the usage value of that equipment which Mr. Clemons added to the premise from the date of the breach to the end of the lease term."
What I'm saying or what I'm trying to say, and I'll take some recommendation, is he is not entitled to a dollar-for-dollar damage award for the improvements and alterations he did to the building, but he isbut his lost of the use of those improvements and additions or alterations to the building is an element that can be factored into the calculation of lost profits.
In other words, I guess what I'm trying to say is, if he'd have been operating the business as he found it, he may have made X amount of dollars. Given that he fixed it up and cleaned it up and painted it and air-conditioned it and did whatever else he did, he may have made X-plus dollars. I think that's something the jury's entitled to consider, the condition it was in when he got it versus the condition it was when it was taken from him, if they find it was taken from him, and the value of the difference in what he lost. Do you see what I'm saying?
MR. CRANE (Evans's attorney): I do see what you are saying. And just for the record
THE COURT: It's just hard to articulate.
MR. CRANE: I understand. But for the record and because I made my motion for directed verdict on the basispartial directed verdict on the basis of the fact that I contend that the plaintiff wouldn't be entitled to any damages on that, I would like to object to this language, period, just for the record.
* * * *
MR. CRANE: I don't know if this will do it, Your Honor, but, "You may consider as one of the elements of these lost profits the contribution that equipment had with regard to the generation of said profits."
THE COURT: The contribution the equipment
MR. CRANE:had or would have had in the generation of said profits.
THE COURT: How about putting "may have had"?
MR. CRANE: Okay.
MR. BETHEA: Judge, I like your version better. I think it's clear, the usage value.
THE COURT: The contribution the equipment may have had to the lost profits, or to what?
MR. CRANE: In the generation of those profits, of the lost profits.
THE COURT: I know it doesn't read very cleanly, but I think, really, the way it's written is probably the best way to say it, and y'all will have to try to explain that to them in argument as best you can.
¶ 74. I fail to see the problem with the instruction. Specifically, I fail to see how *43 the above instruction, when considered in its totality, was so confusing and created the opportunity for double recovery. Moreover, as the above colloquy shows, all parties agreed that Clemons was entitled to recover something for the premature loss of use of the equipment that had been purchased for use in the building over a three-year period. The modification of the instruction offered by Evans's attorney would have allowed the jury to consider, "as one of the elements of lost profits, the contribution that [the] equipment had with regard to the generation of said profits."
¶ 75. It seems clear to me that Clemons was willing to make the substantial investment in the equipment because he thought he would get to use it for at least three years. If Evans unlawfully and prematurely interfered with that use, surely some compensation was due Clemons. It may not have been proper to characterize the compensation due Clemons as an element of "lost profits," but nevertheless, it was a loss for which Clemons should have been compensated. Suppose the breach had occurred immediately after the expenditures were made and before the club actually opened for business, could it be legitimately argued that no compensation was due Clemons? If so, how would it have been characterizedas an element of lost profits, lost investment?
¶ 76. I believe the jury was fairly instructed on how to consider the damage evidence in this case even though it may not have been a perfect instruction. Therefore, I would not disturb the jury's verdict.
KING, P.J., BRIDGES AND LEE, JJ., JOIN THIS SEPARATE WRITTEN OPINION.